(No. 56977

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIE THOMPKINS, Appellant.

*Opinion filed January 25, 1988.—Rehearing denied April 5, 1988.*

412

SIMON, J., dissenting.

James J. Doherty and Paul P. Biebel, Jr., Public Defenders, and Karen A. Popek, Assistant Public Defender, of Chicago, for appellant, and Willie Thompkins, of Pontiac, appellant *pro se*.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Jr., and Donald P. Jonker, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

In an indictment returned in the circuit court of Cook County, defendant Willie Thompkins, Ronnie Moore, and Pamela Thompkins were charged with six counts of murder and felony murder (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)) in connection with the deaths of Gerald Holton and Arthur Sheppard, two counts of

armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2), two counts of concealment of homicidal death (Ill. Rev. Stat. 1979, ch. 38, par. 9—3.1), four counts of aggravated kidnapping (Ill. Rev. Stat. 1979, ch. 38, pars. 10—2(a)(3), (a)(5)), six counts of armed violence (Ill. Rev. Stat. 1979, ch. 38, pars. 33A—2, 9—1(a)(2), 18—2, 10—2(a)(3)), six counts of obstructing justice (Ill. Rev. Stat. 1979, ch. 38, par. 31—4(a)), two counts of solicitation to commit murder (Ill. Rev. Stat. 1979, ch. 38, par. 8—1(a)), two counts of solicitation to commit armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 8—1(a)), two counts of conspiracy to commit murder (Ill. Rev. Stat. 1979, ch. 38, par. 8—2(a)), and two counts of conspiracy to commit armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 8—2(a)), arising out of the shooting deaths of Holton and Sheppard. On defendant's motion, his case was severed from that of Pamela Thompkins. Prior to trial, all of the aggravated kidnapping and armed violence counts, four of the obstructing justice counts, and two of the conspiracy counts against defendant were nol-prossed. Following a jury trial, defendant was found not guilty on the two counts of solicitation to commit murder but was convicted on all counts of the charges remaining. Defendant waived a jury for sentencing, and in a death penalty hearing requested by the People, the court found that one or more of the factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)) existed and found that there were no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death, and the sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). This appeal involves only the conviction and sentence of defendant, Willie Thompkins.

At trial, Keith Culbreath testified for the People in exchange for the State's dropping of delivery of cocaine

charges against him. Culbreath stated that around noon on December 22, 1980, he went to Sandra Douglas' home in Harvey. Sandra was the sister of Culbreath's girlfriend, Sherry Dunigan. Sandra and defendant were present. Shortly after Culbreath's arrival, he went with defendant into the bedroom at defendant's request in order to speak privately. Defendant asked Culbreath if he wanted to make some money by committing an armed robbery, to which Culbreath responded in the affirmative. During this conversation, Culbreath saw two guns in the bedroom, a rifle and a silver .38 with a pearl handle. The two men then left the bedroom, and while doing so, Culbreath told defendant he wanted to go home and get his ski mask to use as a disguise during the armed robbery. Defendant responded, "Don't worry about it, [I'll] take care of that." Culbreath then told defendant he wanted no part of the robbery. Approximately 15 minutes later, Sandra and defendant left. Culbreath further stated that for one month prior to the above meeting, he had seen defendant at Sandra's home almost every day, but he did not see defendant for approximately three to four months thereafter.

Sandra was the People's principal witness at trial and the only occurrence witness to the crimes. Due to the crucial nature of her testimony, it will be necessary to recount Sandra's remarks in some detail.

Sandra testified that she and defendant had been dating for approximately three weeks prior to the murders, and had known each other for three months prior to that. On December 22, 1980, Sandra, Ronnie Moore, and defendant were at Sandra's home in Harvey. Around noon of that day, Keith Culbreath stopped by. Culbreath and defendant went into the washroom together and had a conversation. Sometime after that, Sandra, Moore, and defendant left the house in Sherry Dunigan's automobile

and drove to the home of defendant's sister-in-law, Pamela Thompkins.

Sandra testified that she, together with Moore, Pamela and defendant, went down into the basement of Pamela's home. Located there was a small kitchen, bedroom, and recreation room. The group sat around the kitchen table for a short while talking. Pamela then made a telephone call, during which, Sandra testified over objection, Pamela said "They're here and they have what I told you they would." Approximately 20 minutes after Pamela made the telephone call, two men, whom Sandra had never seen before, arrived. These men were Gerald Holton and Arthur Sheppard. Pamela escorted the two down to the basement kitchen, where Moore and Sandra were seated. Defendant was not present.

Sandra further testified that Holton placed a small, clear plastic bag of cocaine on the table, while he and Moore discussed the cocaine and tasted it. Moore put a small amount of the cocaine into a test tube and instructed Sandra to cook the cocaine on the stove in order to purify it, which she did. When Sandra turned to show the finished product to Moore, she saw defendant standing in the doorway of the kitchen. He pointed a gun with a pearl white handle at the two men and said, "Put—all right put your hands on the table. This is the police." Holton, who was sitting at the table, put his hands on the table, while Sheppard, who had been standing, put his hands up in the air. Moore and defendant tied the two victims up with telephone cords, then dragged them into the recreation room. Afterwards, Sandra saw defendant drag Sheppard into the adjoining bedroom. Sandra and Pamela then went upstairs to Pamela's bedroom. Approximately 15 minutes later, at defendant's request, Sandra drove Moore to a nearby drugstore to buy grain alcohol to be used for free basing cocaine.

Upon their return, Sandra went back into Pamela's bedroom and the two talked for a few hours. At approximately 8 or 9 p.m., Sandra heard a banging sound, "like a small garbage can or something hitting up against something" emanating from the basement. And, after the banging sound stopped, she heard two gunshots come from the basement. At that point, according to Sandra, Pamela grabbed her face with her hands and said, "No, I told them not to do it here. I knew it wouldn't go according to plans."

Sandra then testified that she descended the steps leading to the basement and saw the feet of a body being dragged towards the garage. On the feet were construction boots similar to those worn by Holton earlier. Then Sheppard walked past with his hands tied behind his back and Moore walked behind him with one hand on Sheppard's shoulder, helping him along, and a knife in his other hand. Sandra did not see defendant at this time. She then observed Sherry Dunigan's red Torino pull out of the garage, followed by Pamela's white car. After their departure, Sandra was the only adult left at Pamela's house.

Approximately 35 minutes after the group departed, Sandra received a phone call from defendant. He told her to "go downstairs and clean up a little bit for him." In the basement Sandra saw blood smeared in the recreation room, the bedroom, and in the hallway leading to the garage. She also saw little white balls on the floor and a large pool of blood in the garage. However, because she became very nervous after viewing the scene, Sandra did not clean up the area as defendant instructed, but went back upstairs. Fifteen minutes later, Pamela arrived and paced around the house, "mumbling to herself." Twenty minutes later, defendant called. When Sandra expressed to him her anxiety, he told her to calm down and help Pamela. He instructed her to re-

trieve a gun he had left at Pamela's home and to walk down to the corner of Wood and 163rd Streets, where someone would pick her up.

After locating the gun under the living room couch, Sandra brought it to the designated location where her sister, Sherry Dunigan, picked her up and took her home. When they arrived, Moore and defendant were already there. Defendant then instructed Sandra and Pamela to meet him at the intersection of 147th Street and the expressway. After the two arrived at the location, they followed defendant to the home of defendant's friend, Delmar Watkins, where they spent the night.

The next morning Sandra was taken by Watkins to an apartment on 87th Street, where she was met by defendant. She did not know to whom the apartment belonged. When Sandra questioned defendant as to what the banging noise was she had heard the previous evening at Pamela's home, defendant told her to "just forget about it, the less [she knew], the better off [she'd] be." Upon further questioning, defendant responded that the noise was his "hitting [Sheppard] in the head with a shovel because he [Sheppard] didn't want to get in the trunk." Defendant then told Sandra to go with Watkins in order to wash Sherry Dunigan's red Torino. When the two arrived at the car wash, Watkins opened the trunk and ordered Sandra to stand at the front of the car and let him know if anyone was coming. In the meantime, Watkins sprayed the inside of the trunk with a hose for approximately 45 minutes. When they were finished, the two went to a drugstore and called defendant, after which Sandra drove Watkins to his house, dropped him off, and went home.

The facts at this point are greatly in dispute. Sandra testified at trial that in January of 1982, she fled to Alabama because she thought her life was in danger. In March of that year she called her aunt in Chicago, who

informed Sandra that defendant had been arrested. Upon hearing this, Sandra went to a Birmingham, Alabama, police station and informed an officer there that she was aware of facts and circumstances regarding a murder in Chicago. Due to the controversial nature of the events surrounding Sandra's visit to the Birmingham police station, she was precluded from testifying further about this matter.

Officer Michael Alexander, a Markham patrolman, testified that at about 7:35 a.m. on December 23, 1980, he found the body of Gerald Holton lying face down in a ditch on the west side of Western Avenue between 160th and 161st Streets. Immediately thereafter, he found the body of Arthur Sheppard in a clump of trees about 65 feet from the first body. There were wounds to both men's heads and their hands were bound with telephone cord.

Dr. Robert J. Stein, the Cook County medical examiner, testified that he performed post-mortem examinations on the bodies of both Holton and Sheppard. In his opinion, the cause of each man's death was a bullet wound to the head and brain.

Investigator Henry Wilson testified that at about 10:45 a.m. on March 17, 1981, he received a radio broadcast that there was an arrest warrant for Willie Thompkins for the offense of murder. Twenty minutes later Wilson arrested Thompkins near his home in Markham. Thompkins was subsequently charged with and convicted by a jury of the murders of Holton and Sheppard.

We note initially in this appeal that no post-trial motion has been filed specifying the grounds upon which defendant relies for reversal. Defense counsel stated in her brief that "[t]he trial court, the prosecutor, and defense counsel all agreed that there was no requirement for a defendant who has been sentenced to death to file

a motion for a new trial." While this is clearly not the law in Illinois (Ill. Rev. Stat. 1981, ch. 38, par. 116—1; see also *People v. Caballero* (1984), 102 Ill. 2d 23), we, nevertheless, believe that it would be manifestly unfair to hold that defendant should have filed a post-trial motion in the instant case, in light of his obvious reliance on the statements made by the trial court, the prosecutor and defendant's own counsel that none was necessary.

Defendant first contends that he was denied a fair trial and sentencing hearing because the People did not prove that defendant possessed the requisite intent to kill with properly admitted evidence. Defendant argues that Assistant State's Attorney Phillips, during his opening and closing statements, improperly argued facts which could not be inferred from the evidence. Specifically, defendant contends that Phillips repeatedly misstated Keith Culbreath's testimony regarding his conversation with defendant at Sandra Douglas' home.

During his opening statement, Assistant State's Attorney Phillips told the jury:

"Keith Culbreath, a young man of Sherry's acquaintance, went over to Sandra Douglas' house some time around noon or the early afternoon of December 22nd. While he was there, he had a conversation with a man he will identify as the defendant, Willie Thompkins.

Thompkins said to Keith Culbreath, 'Do you want to make some money.' Keith Culbreath is a young man about 22. He said sure I want to make some money, what's up.

Thompkins said there is a guy that owes me $1100 bucks. We are going to go over there. It's supposed to be a dope deal. We are going to set him up and take him off.

Keith thought about that. He said okay. A little bit later, he told Willie, in fact, I'll go get a ski mask to make sure they won't be able to identify me.

Thompkins told Keith, don't worry about a ski mask, there won't be any identification. At that point, Keith said no way. He wanted nothing to do with anybody getting hurt.''

Keith Culbreath actually stated on direct examination:

"MR. PHILLIPS: Q. After leaving the bedroom with the defendant, Willie Thompkins, did you initiate any further conversation with him about the stick-up he had proposed?

A. Yes.

Q. Where were you when you initiated the conversation?

A. In the front room, going to the kitchen.

Q. And who else was present?

A. Sandra.

Q. What did you say to Thompkins at that point?

A. I wanted to go home and get my ski mask.

Q. You told Thompkins you wanted to go get a ski mask?

A. Right.

Q. Did you tell him why you wanted to go get a ski mask?

A. No.

Q. What did Mr. Thompkins do when you said you wanted to go home and get a ski mask?

A. He said don't worry about it, he'll take care of that.

Q. Where did he say that?

A. Between the front room and the kitchen.

Q. After he said not to worry about it, he would take care of it, did you say anything further?

A. Yes.

Q. What did you say?

A. I didn't want to be a part of it.''

Defendant contends that Phillips "grossly misstated Culbreath's testimony *** and thereby manufactured 'evidence' of Willie Thompkins' intent to kill which simply did not exist." Defendant argues that the proper in-

terpretation of the remark he purportedly made to Culbreath, "Don't worry about it, [I'll] take care of that," is that defendant would provide the necessary masks or disguises to hide their identities, and therefore it would be unnecessary for Culbreath to go home and get his. Defendant maintains that Phillips' comments cannot be characterized as matters reasonably inferable from the evidence, because Culbreath's actual testimony does not support the "brazen assertions and rank speculation in the prosecutor's opening statement." (*People v. Warmack* (1980), 83 Ill. 2d 112.) Rather, defendant urges, Phillips' comments were mere assertions of his own unsworn testimony in lieu of competent evidence. *People v. Weinger* (1981), 101 Ill. App. 3d 857.

The People contend initially that defendant has waived review of this issue by failing to object at trial to any of the allegedly improper comments. (*People v. Davis* (1983), 97 Ill. 2d 1, 24.) They argue that defendant does not present an appropriate situation in which to invoke the plain error rule because the error here is not so prejudicial that real justice has been denied or that the jury's verdict may have resulted from the error. (*People v. Yates* (1983), 98 Ill. 2d 502, 533.) In the alternative, the People submit that should this court consider defendant's contention on its merits, the complained-of comments did not misstate the evidence. They argue that Phillips' opening statement did contain a discussion of matters which could properly be inferred from the evidence (*People v. Albanese* (1984), 102 Ill. 2d 54, 78) and that Culbreath's testimony did present ample evidence to support the inference that defendant told Culbreath he intended to kill the victims.

We need not consider the waiver issue because it is clear that the defendant was not prejudiced by the prosecutor's statements. It is well settled that one of the commonly recognized purposes of an opening statement

is to inform the fact finder of what the evidence will show. (*People v. Warmack* (1980), 83 Ill. 2d 112, 125; *Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 197.) Although it is improper for a prosecutor to comment on what testimony will be introduced at trial and then fail to produce that evidence, he is free to discuss any legitimate inferences which are based on the evidence. *People v. Warmack* (1980), 83 Ill. 2d 112, 125-26.

Defendant attempts to persuade us by arguing that the only inference which any juror could possibly have drawn from Culbreath's testimony is that the defendant would provide the necessary disguises. We find this contention without merit, because the evidence simply does not support defendant's interpretation; at no time during the entire episode did defendant ever provide anyone with disguises or attempt to conceal his or his accomplices' identities in any way. It would be illogical to infer that Culbreath immediately withdrew from the plan simply because defendant would not let Culbreath wear his own particular ski mask. Therefore, we conclude that Phillips did not misstate Culbreath's testimony. It was reasonable for Phillips to infer from the evidence that defendant intended to kill Holton and Sheppard.

Defendant next contends that the circuit court erred in ruling that the People had no discovery obligation under Supreme Court Rule 412 (87 Ill. 2d R. 412) to procure, preserve, and turn over to the defense a written memorandum of a statement allegedly made to a Birmingham, Alabama, police officer by Sandra Douglas.

In reliance on Rule 412(g), defendant maintains that the People have a duty to procure and turn over to the defense the memorandum, even though the memorandum was not in the prosecutor's personal possession. (*People v. Burns* (1979), 75 Ill. 2d 282, 289; 87 Ill. 2d R. 412(g).) Defendant argues that the alleged fact that the

Alabama officer mistakenly or in bad faith destroyed his notes is no excuse for the State's failure to exercise due diligence and make a timely attempt to seek the existence of that memorandum, and, if it were found to be destroyed, to reconstruct the contents thereof for *in camera* inspection by the court. (*People v. Szabo* (1983), 94 Ill. 2d 327; 87 Ill. 2d R. 412(a)(i).) Finally, defendant urges, if such a memo is found to exist, he is entitled to a new trial and the memorandum should be examined by the trial court *in camera* to determine if it contains discoverable matters. In the alternative, if such a memorandum does not exist, defendant claims he is entitled to a new trial at which Sandra Douglas would be barred from testifying. *People v. Allen* (1970), 47 Ill. 2d 57.

Supreme Court Rule 412, in pertinent part, provides:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel;

\* \* \*

(f) The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged.

(g) Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State, and which is in the possession or control of other governmental personnel, the State shall use diligent good-faith efforts to cause such material to be made available to defense counsel; and if the State's efforts are unsuccessful and such material or other governmental personnel are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to defense counsel." 87 Ill. 2d Rules 412(a)(i), (f), (g).

A pretrial *voir dire* hearing was conducted on May 26, 1982, to address "the sole question of the circumstances and events that occurred in Birmingham, on *** March 22, 1981." The evidence produced at this hearing was conflicting. Sandra Douglas testified that she spoke *in personam* to a police officer at the Birmingham police station. As she told him what she knew about the incident in Chicago, he was taking notes. From her observations, these notes were not verbatim, and she did not know what he was writing down. She further testified that she spoke with no other policeman in Birmingham, nor did she sign anything. During the 1½-hour period she remained at the station, she spoke with no one on the telephone and did not know if the policeman she spoke with telephoned anyone. Furthermore, she did not know the name of the officer to whom she gave the statement. Sandra denied that she had previously told defense counsel McGann, the prosecutor, and defense counsel for Pamela Thompkins that she had in fact signed some document.

Defendant's attorney, Mr. McGann, also testified at the *voir dire* hearing. He stated that on May 11, 1982, he interviewed Sandra and she indicated to him that after her conversation with the Birmingham police officer, who took notes while she was talking to him, she did

sign something, although she did not know what she had signed. Furthermore, McGann stated at an earlier pretrial hearing on May 26, 1982, that he had interviewed Sergeant Knight from the Birmingham, Alabama, police department concerning the latter's interview with Sandra. McGann stated that Knight told him that he had received a telephone call from a warden at the Birmingham city jail in March 1982, and was informed that a woman had come into the jail and said that she had witnessed a crime in Chicago. Knight then conversed with Sandra on the telephone. He took notes as she spoke, writing down only the names and addresses of people to contact regarding the crime. After contacting Chicago law enforcement officials, he immediately threw the notes away. Knight also told McGann that the warden on duty who spoke to him concerning this conversation with Sandra was a person whose name he did not recall; however, this warden wanted to take a written statement from Sandra and wanted her to sign it in order to prevent her from later changing her story. Knight told the warden to "do whatever you want to do." Knight did not know whether the warden had actually taken a written statement from Sandra.

After hearing arguments of counsel, the trial court ruled that the State could not be held responsible for the acts of a Birmingham, Alabama police officer who threw the notes away. The court noted that defendant failed to establish whether Knight ever took notes of the conversation with Sandra. The court further noted that the State had gone to great lengths to determine whether any notes existed, or whether Sandra had signed a statement. For these reasons, the trial court declined to bar the testimony of Sandra Douglas.

Our Rule 412 is silent as to those persons whose possession and control of material and information must be imputed to the State. (Ill. Ann. Stat., ch. 110A, par. 412,

Committee Comments, at 610 (Smith-Hurd 1985).) Illinois courts have held that the officers and personnel of the Chicago Police Department Crime Laboratory are investigative personnel within the meaning of Rule 412(f). (*People v. Curtis* (1977), 48 Ill. App. 3d 375, 383.) The State's failure to disclose to the defense a witness' exculpatory statements cannot be excused by the argument that the assistant State's Attorneys were unaware of the statement's existence, since both they and the police are required to cooperate and ensure that all relevant information will be provided and that discovery will be accomplished. (*People v. Trolia* (1979), 69 Ill. App. 3d 439, 450.) Furthermore, this court has ordered a new trial and the reproduction of an assistant State's Attorney's notes containing summaries of pretrial oral statements made by the only occurrence witness where the notes were destroyed by the assistant State's Attorney immediately after their creation. *People v. Szabo* (1983), 94 Ill. 2d 327.

However, *Szabo* is distinguishable from the instant case because the notes there were substantially verbatim reports of oral statements made by the State's key witness, the notes were in the State's possession at the time of their destruction, and such destruction was an intentional tactic on behalf of the People to prevent disclosure of relevant material to the defendant. (94 Ill. 2d at 348.) In the present case, there is no testimony indicating that the notes, either prepared by Sergeant Knight or by an unknown Alabama police officer, contained a substantially verbatim report or summary of Sandra Douglas' conversation with the Alabama law enforcement officials. We also cannot conclude that the Alabama officials are agents of the State or other governmental personnel whose possession and control of the information must be imputed to the Cook County State's Attorney's office. We find support for our conclusion in Rule

412(g), which states that the trial court shall mandate that discoverable material be made available to defense counsel by subpoena or by court order only where the State's diligent good faith efforts to cause the material to be made available to the defense are unsuccessful and "such material or other governmental personnel are subject to the jurisdiction of the court." 87 Ill. 2d R. 412(g).

The record clearly shows that the assistant State's Attorney, although unsuccessful, diligently attempted to obtain the purported memorandum, to contact Sergeant Knight, and to produce the notes at trial. Obviously, Sergeant Knight and the alleged other Alabama law enforcement official are not subject to the jurisdiction of the Illinois courts. We conclude, therefore, that the People had no discovery obligation under Rule 412 to procure and turn over to the defense the alleged memorandum.

Defendant next contends the circuit court erred in permitting Sandra Douglas to testify over objection regarding Pamela Thompkins' out-of-court statements under the co-conspirator exception to the hearsay rule. Defendant argues that Sandra's testimony that Pamela "put her hands up over her face and she said she told them not to do it here, she knew it wouldn't go according to plans," is inadmissible hearsay. Defendant maintains that there was not sufficient evidence independent of Pamela's statement proving she was a member of a conspiracy with defendant, nor was the statement in furtherance of that conspiracy, both of which must be proved if the statement is to fall within the co-conspirator exception to the hearsay rule. *People v. Goodman* (1980), 81 Ill. 2d 278.

The People argue that Pamela's statement is admissible under either the co-conspirator exception or the spontaneous-declaration exception to the hearsay rule. The People urge that other evidence independent of

Thompkins' out-of-court statement was sufficient to make a *prima facie* case of the existence of a conspiracy between defendant and Pamela. They argue that the record shows that Pamela called the victims and told them to come to her home, that the crimes took place there, that she led them to the basement after they arrived, and she actively participated in concealing the homicide. *People v. Goodman* (1980), 81 Ill. 2d 278.

However, regardless of the People's contention that Pamela's statement was admissible under the co-conspirator exception, we find the statement was admissible as a spontaneous declaration. The fact that the trial court may have admitted the statement under another exception to the hearsay rule is immaterial since "the question before a reviewing court is the correctness of the result reached by the trial court, and not the correctness of the reasoning upon which that result was reached." (*People v. York* (1963), 29 Ill. 2d 68, 71.) In *People v. Jones* (1985), 105 Ill. 2d 342, citing *People v. Robinson* (1978), 73 Ill. 2d 192, this court restated the test used to determine whether a statement falls within the spontaneous-declaration exception to the hearsay rule:

> " 'This court has repeatedly held that, for testimony to qualify as a spontaneous declaration and be admissible regardless of declarant's presence at trial, three elements must be present: "(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence." (*People v. Poland* (1961), 22 Ill. 2d 175, 181.) As this court noted in *Poland*, "The pertinent point is whether there was a lack of sufficient time to allow an opportunity for reflection and invention." (22 Ill. 2d 175, 181.)' (73 Ill. 2d 192, 199.)" 105 Ill. 2d 342, 354.

The record is clear that these elements were met. First, the firing of gunshots in the basement of Pamela's home was an occurrence sufficiently startling to produce

her spontaneous response. Second, her statement was made immediately upon hearing the shots; therefore, there was no time to fabricate. Third, the statement was directly related to the circumstances of the shooting since Pamela's remark clearly expressed her knowledge that the shooting had something to do with their robbery plans. We therefore conclude that Pamela's statement was properly admitted under the spontaneous-declaration exception to the hearsay rule.

Defendant next contends that he was denied a fair trial because Assistant State's Attorney Phillips' rebuttal argument contained an improper and prejudicial remark. In rebuttal closing argument, Phillips, attempting to bolster the credibility of Sandra Douglas, argued with reference to Sandra's visit to the Birmingham, Alabama, police station:

> "The minute she found out that Willie Thompkins was in custody, what did she do. She went to the Birmingham Police. Is that the conduct of an accomplice? Is that the conduct of a guilty person?
>
> We have witnesses that we have to work a lot harder to find, but she just walks into a police station and tells them exactly what she told you ladies and gentlemen.
>
> MR. McGANN: Objection. There is no evidence of that.
>
> THE COURT: Overruled."

Defendant argues that the prosecutor's comment, intimating that Sandra told the Birmingham police the same story which she had told the jury, constitutes an assumption and statement of fact not based upon the evidence and is an improper substitution of the unsworn testimony of the prosecutor for competent evidence. (*People v. Whitlow* (1982), 89 Ill. 2d 322, 341; *People v. Rothe* (1934), 358 Ill. 52, 56.) Defendant urges that no evidence had been admitted as to the content of Sandra's statements to the Birmingham law enforcement officials be-

cause Sandra was not allowed during direct examination to testify regarding this matter. Therefore, defendant concludes, Phillips improperly bolstered the testimony and the credibility of Sandra with supposedly prior consistent statements which had not been admitted into evidence, clearly directing the jury to conclude that Sandra's in-court testimony must be true.

Although we agree with defendant that the prosecutor commented upon matters which were not in evidence, we do not believe that such commentary constituted an improper bolstering of Sandra's testimony. The record shows that the prosecutor and the judge repeatedly told the jury that the lawyers' arguments are not evidence and that the jurors are the sole judges of the believability of the witnesses. Since the jurors heard Sandra's testimony, as well as all other evidence, they were in the best position to evaluate Sandra's credibility. The prosecutor's isolated comment, although improper, did not result in substantial prejudice to defendant, and thus did not constitute reversible error. *People v. Collins* (1985), 106 Ill. 2d 237, 276; *People v. Tiller* (1982), 94 Ill. 2d 303, 321.

Defendant next contends that the circuit court erred in denying his motion to suppress an inculpatory statement which defendant allegedly gave to Cook County sheriff's police investigator James Houlihan on March 18, 1981, while in custody at the Cook County sheriff's police investigations office. Defendant argues that the statement was obtained after his sixth amendment right to counsel had attached, without counsel being present, and without his knowing and intelligent waiver of that right. (*Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232; *People v. Owens* (1984), 102 Ill. 2d 88.) Defendant also argues that the statement was obtained in violation of his fifth amendment right to counsel pursuant to *Miranda v. Arizona* (1966), 384

U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, because it was the result of an interrogation initiated by the police after defendant had invoked his *Miranda* rights.

At a pretrial hearing on defendant's motion to suppress, investigator Houlihan testified that he and another investigator interrogated defendant on March 18, 1981, while defendant was in the lockup area next to the preliminary hearing courtroom awaiting his initial court appearance. According to Houlihan, defendant was advised of his *Miranda* rights and acknowledged understanding these rights. Nevertheless, defendant elected to proceed with the interrogation without the assistance of counsel. The interrogation lasted approximately 1½ hours, at the end of which defendant admitted participating in the shootings, gave details of the incident, and expressed his desire to give a statement to Assistant State's Attorney Paul Perry. However, after Perry was summoned, defendant refused to make a statement on the basis that he had just spoken by telephone with his attorney, George Howard, and had been advised not to make any statements. These events took place immediately prior to defendant's bond hearing.

At the same hearing, George Howard testified that after being contacted by defendant's wife on March 17, 1981, regarding representation of defendant, he telephoned defendant at the Cook County sheriff's police department and briefly spoke with defendant. He instructed defendant to refrain from making any statements to the authorities. Howard specifically stated that he was never retained as defendant's attorney, nor did he ever file an appearance on defendant's behalf in the case.

Defendant testified on his own behalf at the hearing. He stated that he understood the *Miranda* rights given to him and that he knew that he had the right to have an attorney present. He stated that when arrested on

March 17, 1981, he was not told that he was being taken into custody pursuant to an arrest warrant for the offense of murder, but rather, that he was wanted for questioning pursuant to an investigation. He further testified that while being interrogated by investigator Houlihan on March 18, 1981, he told the officer that he would not make any statements because his attorney would arrive shortly and any deals could be worked out with that attorney. Defendant specifically denied giving a statement to the investigators.

It is well established that the right to counsel provided by the sixth amendment exists independently of those rights under the fifth amendment. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Owens* (1984), 102 Ill. 2d 88, 99.) Therefore, we will address each separately.

It has traditionally been held that the sixth amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882; *Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1240.) More recent pronouncements of the Supreme Court, in reliance on *Kirby* and *Brewer*, have held that a defendant "has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches. *United States v. Gouveia*, 467 U.S. 180, 187 [81 L. Ed. 2d 146, 153, 104 S. Ct. 2292, 2298] (1984); [citations]." (*Moran v. Burbine* (1986), 475 U.S. 412, 428, 89 L. Ed. 2d 410, 425, 106 S. Ct. 1135, 1145.) Judicial criminal proceedings are initiated when "the government has committed itself to prosecute, and *** the adverse positions of government

and defendant have solidified." *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882; *Maine v. Moulton* (1985), 474 U.S. 159, 172-73, 88 L. Ed. 2d 481, 493-94, 106 S. Ct. 477, 485.

We agree with the People that, at the time of his interrogation, defendant's sixth amendment right to counsel had not yet attached because formal adversary judicial proceedings had not been initiated against him. Only a complaint for preliminary examination charging defendant with murder had been issued; the record shows, and defendant concedes, that he had been neither indicted nor arraigned. The complaint did not constitute a formal commitment by the People to prosecute defendant. Therefore, since defendant's sixth amendment right to counsel had not yet attached at the time he gave the inculpatory statement, that statement was properly admitted at trial. See *Kirby v. Illinois* (1972), 406 U.S. 682, 689-90, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882; *People v. Owens* (1984), 102 Ill. 2d 88, 101.

Nor can we agree with defendant that he had invoked his fifth amendment right to counsel "by speaking with an attorney whom he wished to retain after having received the *Miranda* warnings." Although the general holding of *Miranda* requires that custodial interrogation of an accused be preceded by the advice that he has the right to remain silent and the right to the presence of an attorney, and that once these rights are invoked, all interrogation must cease, these rights may nevertheless be validly waived where, with full awareness and comprehension of all the information *Miranda* requires the police to convey, the defendant voluntarily decides to speak. (*Moran v. Burbine* (1986), 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141.) The waiver must be voluntarily made, constituting a knowing and intelligent relinquishment of a known right. (*Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S.

Ct. 1880; *People v. Owens* (1984), 102 Ill. 2d 88, 100.) Furthermore, once an accused has been advised of his rights and indicates that he understands them, his choosing to speak and not to request counsel is evidence that he knows his rights and chooses not to exercise them. *People v. Burbank* (1972), 53 Ill. 2d 261, 266.

We cannot agree with defendant that "his speaking with an attorney whom he wished to retain after having received the *Miranda* warnings" constituted the invocation of his fifth amendment right to counsel. The record shows that, on several occasions during the March 17-18 interrogatory period, defendant acknowledged that he understood each of his *Miranda* rights, and thereafter freely spoke with the assistant State's Attorney and the investigators. Defendant himself testified that, from past experiences, he knew he had the right to have counsel present. We, therefore, believe the record shows defendant unequivocally waived his right to remain silent and to have the assistance of counsel.

Defendant next contends that evidence seized pursuant to a search warrant on Pamela Thompkins' home should not have been admitted at trial because the search warrant was issued without probable cause. Defendant argues that because the search warrant was executed 83 days after the murders took place, probable cause was not current, and there was no apparent evidence indicating that the facts upon which the warrant was issued were still in existence at the time the warrant was issued. (*United States v. Beltempo* (2d Cir. 1982), 675 F.2d 472, 477.) Defendant asserts that probable cause exists only where the sought-after evidence is presently on the premises to be searched (*People v. Holmes* (1974), 20 Ill. App. 3d 167), and that "probable cause ceases to exist when it is no longer reasonable to presume that items, once located on the premises, are still there." (*United States v. Brinklow* (10th Cir. 1977),

560 F.2d 1003, 1005.) Defendant submits that it is not reasonable to presume that the items sought in the search warrant—telephone extension cords, blood stains, hair fibers, and all evidentiary material relating to the offense—were in existence almost three months after the murders took place.

To justify a present search, probable cause must be current and not rest upon facts which existed in the past, unless there is a reason to believe those facts are still in existence. (*Brinegar v. United States* (1949), 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302.) Whether probable cause exists is determined on a case-by-case basis, the conclusion resting upon an application of "practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310; *United States v. Beltempo* (2d Cir. 1982), 675 F.2d 472, 477.

Courts have declined to adopt an arbitrary cutoff period expressed in days or weeks beyond which probable cause ceases to exist, rationalizing that such a conclusion "improperly substitutes a rigid formula for the informed judgment which it is the duty of a magistrate to exercise." (*United States v. Beltempo* (2d Cir. 1982), 675 F.2d 472, 478.) Rather, courts have found other factors to be as important as the time element:

> "[These factors] include the nature of the object sought, its location on the premises and the state in which it was observed. The nature of the object would encompass such considerations as whether it is large or small, moveable or fixed, disposable or permanent and innocuous or incriminating. The location of an object on the premises would involve, for example, whether it was in plain sight on a table, locked in a safe, on a beam in a cellar or secreted behind a bricked-in wall. The state in which the object was seen is especially important today because modern technology and equipment have the sophisticated

capacity to ascertain whether matter—in whatever form it may be—is present or even may have once been present. This technology can detect, for example, a blood stain on clothes, furniture or rug; a gas that evaporates; a solid that dissolves and disappears, or one that changes into a powder or a liquid that seeps into a fabric, or dust that is suspended in air and whose particles may later be found on the top ledge of a door. The inquiry with respect to probable cause in the case of an observation of an isolated incident should focus on all of the relevant circumstances, including the element of time lapse, to determine the probability of the continued existence of the object sought at the place where it was last seen. The overall approach should be one of flexibility and common sense." 675 F.2d 472, 478.

In the instant case, common sense dictates that the property sought was of such a nature that it was still in existence at the time of the search. A telephone cord is an article which could reasonably be expected to be kept in a home for extended periods, it is designed for long term use, likely to be functional, and not contraband or likely to be disposed of for any apparent reason. (*United States v. Brinklow* (10th Cir. 1977), 560 F.2d 1003.) Furthermore, it is reasonable to believe that blood stains on a concrete floor which neither bleach nor acid could remove would still be detectable a few months later. We conclude that there was a "fair probability" that the evidence in question would be found in Pamela's home in March of 1981. *People v. Gacy* (1984), 103 Ill. 2d 1, 22.

Defendant next contends that comments made by the court and by Assistant State's Attorney Perry prejudicially chilled defendant's exercise of the right to counsel of his choice. (*Powell v. Alabama* (1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55.) Defendant argues that the trial court erroneously told defendant that recent legislation allowed the court to take some or all of his bail bond deposit as payment to reimburse appointed counsel.

This comment, defendant urges, precluded defendant from retaining private counsel by misleading him into believing that he would have no funds to pay a private attorney after his bail bond deposit was withheld by the court.

This argument is flawed in two respects. First, the record does not show that the court unequivocally expressed an irrevocable intent to withhold defendant's bail bond deposit. The court merely stated that it thought there was some authority allowing the reimbursement of court-appointed counsel with bail bond money, although the court was unclear as to the terms of the statute and was unable to speak with any degree of specificity. Second, even after the court made the allegedly chilling comments, defendant persisted in his desire to seek private counsel. Furthermore, defendant himself admitted that any agreement between himself and private counsel relative to fees "would have nothing to do with the bond." Thus, from defendant's own actions and words, it appears that no infringement upon his right to counsel had occurred.

Defendant also argues that one week after the court's allegedly prejudicial comments were made, while defendant was still attempting to retain George Howard as private counsel, the assistant State's Attorney telephoned Howard's secretary and informed her that since the court intended to order defendant's bail bond deposit be used to reimburse the county for the costs already incurred by his appointed counsel, there would probably be no funds left from that bond money for Howard's services. The secretary answered that Howard was unaware of this action, but would contact the court shortly. Such contact was never made.

Here, too, we find no unconscionable intrusion into defendant's attempt to exercise his right to counsel of his own choice. The right to counsel envelops the notion

that a defendant "should be afforded a fair opportunity to secure counsel of his own choice." (*Powell v. Alabama* (1932), 287 U.S. 45, 53, 77 L. Ed. 158, 162, 53 S. Ct. 55, 58.) All that is required is that a defendant be given "full opportunity to select and employ his own attorney." (*People v. Walsh* (1963), 28 Ill. 2d 405, 409.) We do not believe that the prosecutor's conversation with Howard's secretary could have in any way stifled Howard's representation of defendant, since defendant had been unsuccessfully attempting to retain Howard as counsel for one week prior to the conversation. Moreover, Howard stated at the hearing on the motion to suppress that he was never retained as counsel for defendant. Although it is not clear from the record why Howard chose not to represent the defendant, we cannot say that his decision resulted from any action on the part of the court or the prosecutor. We find here that defendant was given the sufficient opportunity to select and, if able to do so, employ the attorney of his choice.

We next address defendant's contention that the trial court erred in denying his motion for mistrial on the basis that the court improperly commented upon defendant's right to remain silent at trial. During *voir dire*, defense counsel tendered the following instruction: "Do you understand that the defendant does not have to testify, and that if he does not testify or offer any evidence, you cannot consider that in arriving at your verdict?" After being reminded by defense counsel to ask this question, the court instructed the venire as follows:

"I want to reemphasize that the right of a defendant under the Fifth Amendment to the Constitution of the United States to require full compliance with the Fifth Amendment by the State, and to remind you that the defendant again has the right to remain silent and among other things the Fifth Amendment says the defendant need not testify, need not incriminate himself, and that

should a defendant so elect, you cannot consider that in reaching the question of whether or not he was proven guilty beyond a reasonable doubt."

Defense counsel immediately moved for a mistrial, and, at a side bar discussion, the court stated that he would clear the matter up with the prospective jurors.

It is a violation of the fifth amendment for a trial judge to actually tell a jury that a defendant's failure to testify supports an unfavorable inference against him. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) We agree with defendant that he was entitled to have the prospective jurors asked the question tendered by his counsel during *voir dire*. (*People v. Zehr* (1984), 103 Ill. 2d 472.) However, based upon the record as a whole, the court's statement did not constitute an adverse comment on defendant's failure to testify. At the beginning of *voir dire*, the court correctly instructed the venire panel that:

"It follows that if it's the burden of the State to prove the charge beyond a reasonable doubt, that the defendant has no obligation to defend, he has no obligation to defend, and it is an essential corollary of those propositions that if a defendant elects not to testify, he exercises his Fifth Amendment right to remain silent, that you can take or make no inference of guilt from his silence.

So when and if a defendant charged elects to remain silent, he puts a legal burden on the Court to determine whether, at some point, the State has established the charge against him beyond a reasonable doubt. And likewise upon you.

But it's important that you keep in mind that at no time should you ever consider his silence as evidence of anything other than the exercise of his right to remain silent."

Furthermore, at the close of the evidence the court instructed the jury, pursuant to Illinois Pattern Jury Instructions (IPI), Criminal, No. 2.04 (2d ed. 1981): "The

fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict." The one isolated sentence complained of here by defendant did not constitute an allusion to the misconception that defendant's failure to testify was to avoid incriminating himself, especially where the record indicates the jurors were properly instructed at two other instances. Furthermore, the court stated that he would correct any mistakes, and, given the record as a whole, we find nothing which would leave the jury to infer that defendant's failure to make a statement was to be counted against him.

Defendant next contends that the trial court improperly refused a defense-tendered instruction concerning the credibility of drug-addict witnesses where Sandra Douglas testified to using cocaine at or about the time of the murders. At the instructions conference, defendant tendered the following non-IPI instruction:

> "The Court instructs the jury that when determining the evidentiary worth of the testimony of a narcotic addict, the jury must not judge the testimony as it would that of any other type of—another type of witness. The jury must look upon the testimony of a narcotic addict with great suspicion and act upon it with great caution.
>
> If the jury finds that a witness were an addict or used narcotics at about the time of the alleged offense, such finding would be an important factor to the general reliability or believability of the addict, ***."

Defendant argues that where the evidence shows that a prosecution witness was an addict or habitual narcotics user either at the time of trial or at the time of the offense, the defendant is entitled to a properly worded instruction on the weight the jury may give the witness' testimony. (*People v. Franz* (1977), 54 Ill. App. 3d 550; *People v. Garrett* (1976), 44 Ill. App. 3d 429; *People v. Franklin* (1974), 22 Ill. App. 3d 775.) Defendant relies

on *People v. Strother* (1972), 53 Ill. 2d 95, 99, for the proposition that the testimony of an habitual narcotics user is subject to great suspicion and must be given close scrutiny.

Sandra Douglas testified at trial that she started using cocaine approximately two months prior to meeting defendant, that she used the substance as much as twice a week from August through December of 1980, but that she had stopped using cocaine at the time of trial. There was no indication she was under the influence of the drug at the time of the murders.

We cannot agree with defendant that Sandra's testimony provided a basis for giving his tendered instruction. No evidence was presented which would indicate that Sandra was an addict or an habitual user of cocaine. Furthermore, defendant's tendered instruction was a non-IPI instruction, the giving of which is within the trial court's discretion. (107 Ill. 2d R. 451(a).) Since the proposed instruction was not supported by the evidence, the court did not err in refusing to give this instruction to the jury.

Defendant next claims as error the trial court's limitation of defense counsel's cross-examination of Keith Culbreath. Specifically, defendant contends that the trial court erroneously restricted the cross-examination of Culbreath concerning Culbreath's pending cocaine delivery charge.

The general rule is that a witness may be cross-examined concerning those matters which would show the witness' bias, motive, or willingness to testify. (*People v. Owens* (1984), 102 Ill. 2d 88, 103; *People v. Steel* (1972), 52 Ill. 2d 442, 447.) However, the latitude of such an inquiry is within the discretion of the trial court. (*Owens*, 102 Ill. 2d at 103.) The court's "substantial discretion" (*People v. Coles* (1979), 74 Ill. 2d 393, 395-96) will only be reversed where an abuse of that discretion results in

manifest prejudice to the defendant (*People v. Brisbon* (1985), 106 Ill. 2d 342, 362).

Here, Culbreath admitted at trial that he made a deal with the State whereby the delivery-of-cocaine charge would be dropped in exchange for his honest testimony. Pursuant to this agreement, Culbreath said, he was placed in protective witness quarters apart from the general jail population, and would be relocated after he testified. This evidence was more than sufficient to point out to the jury that Culbreath was biased in favor of the prosecution. Therefore, we find that the error here, if any, in limiting cross-examination was harmless beyond a reasonable doubt. See *People v. Owens* (1984), 102 Ill. 2d 88, 104.

Defendant next argues that Culbreath's testimony on redirect examination stating that he had asked the People for relocation because he was afraid defendant would harm him was improper and denied defendant his constitutional rights to a fair and impartial trial. Defendant also contends that the prosecutor, during closing argument and rebuttal closing argument, commented upon Culbreath's fears, which only served to severely prejudice defendant. Defendant relies on *People v. Herbert* (1935), 361 Ill. 64, for the proposition that where the prosecutor, through the use of leading questions and over defense objection, elicits testimony which tends to create in the minds of the jurors the impression that a prosecution witness has been intimidated with threats of violence by the defendant, the prejudice is so severe that reversal is required. See also *People v. Dace* (1983), 114 Ill. App. 3d 908; *People v. Mostafa* (1971), 5 Ill. App. 3d 158.

During cross-examination of Culbreath, defense counsel attempted to impeach Culbreath by bringing out the fact that he had entered into a favorable deal with the People in exchange for his testimony:

"Q. Now, did Mr. Phillips make any deal with you concerning where you would be incarcerated before you made the bond [on the delivery-of-cocaine charge]?

A. Yes, he did.

Q. What did he say to you?

A. He said if I give an honest testimony, that he would give—he would drop the cocaine charges and relocate me.

Q. Now, this cocaine charge, you are not in the regular jail, are you?

A. No sir.

Q. You are in witness quarters?

A. Yes, sir.

Q. That's not with the general population?

A. No, sir.

Q. So if you had been put in jail for selling this half of a gram of cocaine, you would have gone into the general population, is that right?

A. Yes, sir.

Q. Is that part of your deal, that you wouldn't have to go into the common jail of Cook County?

A. Yes, sir."

Then, on redirect examination and in response to defense counsel's attempt to impeach the witness, the following colloquy ensued between the People and Culbreath:

"Q. I believe you said [on cross-examination] I also agree to relocate you following your truthful testimony in this case, correct?

A. Correct.

Q. Did you ask for relocation because you are afraid of what your testimony might do for you in this case?

MR. McGANN: Objection.

THE COURT: Overruled.

THE WITNESS: Correct.

MR. PHILLIPS: Q. Who are you afraid of?

A. (Indicating).

MR. PHILLIPS: Indicating for the record, your Honor, the defendant, Willie Thompkins."

The cases cited by defendant in support of his argument are distinguishable because the prosecution witnesses there actually testified that they had in fact been intimidated or threatened by the defendants. Here, however, Culbreath did not testify that he had received threats from defendant. Furthermore, any inquiry into Culbreath's fears on redirect was merely an attempt by the prosecutor to rehabilitate his witness. The subject matter of Culbreath's relocation was initially brought out on cross-examination, as is indicated by the above colloquy. Defense counsel had attempted to impeach Culbreath by informing the jury that Culbreath had entered into a favorable deal with the People in exchange for his testimony. This entire procedure was obviously part of defense counsel's strategy designed to show that Culbreath was not credible. However, where the door to a particular subject is opened by defense counsel on cross-examination, the People may, on redirect, question the witness to clarify or explain the matters brought out during the previous cross-examination. (*People v. Kostos* (1961), 21 Ill. 2d 496.) Redirect examination is a tool used by prosecutors to remove or correct unfavorable inferences left by the preceding cross-examiner. (*People v. Hampton* (1962), 24 Ill. 2d 558.) We find no abuse of discretion in allowing the prosecutor to rebut defense counsel's allusion that Culbreath was biased and had a strong motive to testify falsely.

Defendant also complains that the prosecutor's closing and rebuttal closing arguments, which contained references to Culbreath's fear of defendant, caused irreparable prejudice. During closing argument, the assistant State's Attorney stated with regard to Culbreath: "He's afraid, he's afraid of Willie Thompkins." During rebuttal closing argument, the prosecutor commented: "Until Willie Thompkins was arrested, Keith [Culbreath] was

afraid and he is still afraid today, not of a charge of delivery of a half-gram of cocaine, he's afraid of Willie Thompkins." Defendant argues that prosecutorial comments such as the above which assert or suggest that a witness is afraid to testify because he has been threatened or intimidated by the defendant, when not based upon evidence produced at trial, are so highly prejudicial and inflammatory that reversal is necessary. *People v. Ray* (1984), 126 Ill. App. 3d 656, 662.

Prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant (*People v. Pittman* (1982), 93 Ill. 2d 169, 176), considering the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. (*People v. Bryant* (1983), 94 Ill. 2d 514.) Culbreath's fears of defendant had already been made a part of the record, and as such, the prosecutor could comment upon this evidence and draw all legitimate inferences therefrom. (*People v. Albanese* (1984), 102 Ill. 2d 54, 77-78; *People v. Yates* (1983), 98 Ill. 2d 502, 532.) The complained-of arguments above were so insignificant and unimportant at trial they could in no way have constituted a material factor in defendant's conviction, without which the jury might have reached a different result. *People v. Lyles* (1985), 106 Ill. 2d 373, 391.

Defendant also argues that Phillips' closing argument contained improper and prejudicial remarks, namely comments which were inflammatory, designed only to arouse the jury's sympathy for the victims, and suggestions to the jury that additional evidence of defendant's guilt existed which was not admitted at trial because of defendant's invocation of the rules of evidence. As our above analysis indicates, the People are afforded great latitude in closing argument, and, absent a clear abuse

of discretion, the determination of the trial court as to the propriety of such argument should be followed. (*People v. Smothers* (1973), 55 Ill. 2d 172.) Since none of the complained-of arguments exceeded the bounds of legitimate argument, no error occurred.

Defendant next contends that the court improperly admitted testimony concerning one of the victim's families which was irrelevant and highly prejudicial, thereby denying defendant a fair trial. Lynetta Sheppard testified that she had been Sheppard's common law wife for three years and that the two had a one-year-old child at the time Sheppard was killed. Defendant contends that this testimony had no evidentiary value with respect to defendant's guilt or innocence and served only to inflame the passions of the jury and to engender sympathy for Sheppard's family. He urges that this court has repeatedly denounced the admission of evidence that a murder victim has left a spouse or children since such evidence has no relationship to, and does nothing to enlighten the jury as to, the guilt or innocence of the accused; rather, such evidence serves to inflame the jury and to prejudice the defendant in the jury's eyes. *People v. Ramirez* (1983), 98 Ill. 2d 439, 452-54; *People v. Davis* (1983), 97 Ill. 2d 1, 27-28.

As the People point out, Lynetta Sheppard served only as a life and death witness for the purpose of establishing the identification of the decedent. Such testimony is plainly admissible for those purposes. (*People v. Yates* (1983), 98 Ill. 2d 502, 530; *People v. Free* (1983), 94 Ill. 2d 378, 413-15.) Furthermore, it is not always error to admit evidence showing that a murder victim has left a spouse or children when such evidence is elicited in an incidental manner not causing the jury to believe such evidence is material. (*People v. Jordan* (1967), 38 Ill. 2d 83, 91-92.) Clearly, the complained-of testimony here does not support defendant's contention that Lynetta

Sheppard's testimony was elicited solely for its prejudicial value or that it even had such an impact. Lynetta Sheppard merely testified that she was the common law wife of Arthur Sheppard, that she had a child by the decedent, and identified a photograph of him when alive. This isolated reference to Arthur Sheppard's family appears to have been incidental and not calculated and, when considered in context and in relation to the entire record, was not presented in such a manner as to cause the jury to believe it material as to defendant's guilt. *People v. Free* (1983), 94 Ill. 2d 378, 415.

Defendant also maintains that the performance of his court-appointed counsel, while not demonstrating total incompetency, was so ineffective that he was deprived of due process of law. To support this contention defendant claims his counsel: (1) failed to insist upon the presence of a court reporter during *voir dire*, thereby precluding his appellate counsel from raising any potential issues regarding improper excusal of prospective jurors *(United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039); (2) failed to object to the prosecutor's misstatements regarding Keith Culbreath's testimony that he wanted to get a ski mask for a disguise; and (3) made several misstatements regarding the evidence, which inflamed the jury against defendant.

The criteria for determining incompetency of counsel are strict. The Supreme Court, in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, adopted a two-prong test to determine whether assistance of counsel has been ineffective. That standard was adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504, 525:

> "[First,] the constitutionally guaranteed assistance of counsel has not been provided if the defendant can prove that counsel's representation fell below an objective standard of reasonableness and that counsel's shortcom-

ings were so serious as to 'deprive the defendant of a fair trial, a trial whose result is reliable.' (466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) [Second,] a defendant must establish 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.)"

The burden is on the defendant to prove prejudice (466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064), and the inquiry as to counsel's performance must be "whether counsel's assistance was reasonable considering all the circumstances." 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; *People v. Collins* (1985), 106 Ill. 2d 237, 273.

Applying the *Strickland* test, it cannot be said that defendant's counsel was ineffective. This court has held that the mere failure to obtain the presence of a court reporter during *voir dire* does not constitute a *per se* presumption of ineffectiveness of counsel. (*People v. Steel* (1972), 52 Ill. 2d 442, 452.) Furthermore, defendant's reliance on *United States v. Cronic* is in error because the failure to insist upon the presence of the court reporter during a portion of the *voir dire* proceedings is not such an extreme and limited circumstance, such as the total absence of counsel, where prejudice can be presumed. The record, as a whole, shows that defendant did receive diligent, vigorous, and competent representation. Defense counsel was highly experienced and diligently prepared in conducting defendant's case.

Defendant contends next that the sentencing hearing was unfair where the circuit court erroneously admitted evidence of nonstatutory aggravating factors along with evidence regarding defendant's eligibility for the death penalty. Defendant urges that prior to the court's determination of whether the evidence showed defendant's in-

tent to kill, the assistant State's Attorney introduced hearsay testimony of defendant's 1971 conviction for attempted murder and evidence that the victim of that crime was now dead. Over objection, the court admitted this testimony on the basis that it went to the aggravation phase. The court had earlier informed both counsel that a bifurcated proceeding was unnecessary since he was "perfectly capable of separating the two phases as required." Defendant argues that the evidence of his prior conviction for attempted murder, and of the subsequent death of the victim, should not have been admitted because it would be impossible for the court to separate and apply this evidence. He urges that where such evidence, irrelevant to his eligibility for death, is introduced at the first phase of a bifurcated sentencing hearing, the sentence must be reversed and the cause remanded. *People v. Davis* (1983), 97 Ill. 2d 1.

In *People v. Del Vecchio* (1985), 105 Ill. 2d 414, we upheld a unitary sentencing hearing and found that evidence of the defendant's past felony convictions as proof of nonstatutory aggravating factors was admissible and that failure to hold a bifurcated hearing did not prejudice the defendant. (105 Ill. 2d at 432.) It is highly unlikely that the evidence of defendant's prior conviction for attempted murder could have affected the court's decision regarding defendant's sentence. We believe no error occurred here, but as this court said in *People v. Albanese* (1984), 104 Ill. 2d 504, 539, "it would be preferable, although not constitutionally required, for the court to state its finding on defendant's eligibility for the death sentence under section 9—1(b) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)) before proceeding to hear evidence in mitigation or nonstatutory evidence in aggravation under section 9—1(c) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c))." Therefore, since defendant's sentencing hearing

was in compliance with our death penalty statute, defendant's sentence need not be reversed.

Defendant next argues that the circuit court erred when, in accordance with Illinois law, he removed for cause 13 prospective jurors who stated that they could not under any circumstances vote for the imposition of the death penalty. Defendant argues that such exclusion was improper under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, and results in conviction-prone juries, thereby unconstitutionally depriving defendant of a jury drawn from a fair cross-section of the community. *Grigsby v. Mabry* (8th Cir. 1985), 758 F.2d 226, 228.

The prospective jurors in this case were not improperly excluded. This court has consistently rejected the argument that the qualification of prospective jurors pursuant to *Witherspoon v. Illinois* results in a conviction-prone jury. (*People v. Collins* (1985), 106 Ill. 2d 237.) Furthermore, the Supreme Court has recently reversed the Eight Circuit's decision in *Grigsby v. Mabry*. In *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758, the Court held:

> "In sum, '*Witherspoon*-excludables,' or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement." *Lockhart v. McCree* (1986), 476 U.S. 162, 176-77, 90 L. Ed. 2d 137, 150, 106 S. Ct. 1758, 1766.

We next address defendant's contention that the death penalty is an inappropriate penalty where defendant did not personally kill the victims, and where his character is one of a hard-working family man forced to leave his full-time employment because of an incurable illness. Defendant points out that during his four-year

prison term for his attempted murder conviction in 1971, he completely rehabilitated himself, earned a G.E.D., and learned a profession as a medical assistant. After his release from prison, he worked as a respiratory therapy assistant at the Rehabilitation Institute of Chicago and married his present wife. They have three children and own their own home in Markham. In 1976, defendant began work as a paramedic for the Cook County department of corrections, but was forced to leave that job in 1980, being diagnosed with sarcodosis, a rare and incurable disease which affects the respiratory system predominantly of black males. Until his arrest, defendant worked periodically for his father in the construction business. While released on bond on his present charge, he spent most of his time helping out his family while his wife worked, but continued to look for full-time employment. At the time of trial, defendant was scheduled to begin full-time employment with the City of Chicago, counseling and rehabilitating gang members. Defendant argues that the above scenario indicates that he is a hard-working family man who, after having abandoned his gang activities some 15 years ago, has become a solid citizen. He argues that such circumstances do not merit the imposition of the death penalty. *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869; *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *People v. Carlson* (1980), 79 Ill. 2d 564, 590.

We disagree. Although there is no evidence in the record as to who actually shot the victims, defendant's intent to kill may be inferred from Sandra Douglas' testimony that she saw defendant point a gun at the victims, from Keith Culbreath's testimony as discussed previously in this opinion, and from the statement made by Pamela Thompkins to Sandra Douglas, alluding to the fact that Ronnie Moore, defendant, and she had previ-

ously discussed murdering Holton and Sheppard. Even though defendant may have not been the actual shooter, the evidence shows, at the very least, that he planned and actively participated in the armed robbery, murder, and the subsequent concealment thereof. Although there may be no direct evidence establishing that it was in fact the defendant who shot the victims, we believe the proof adduced at trial is sufficient to sustain defendant's conviction and sentence under the principle of accountability. The testimonies of Keith Culbreath and Sandra Douglas establish that defendant was a principal character in the common enterprise obviously bent upon committing acts of violence upon the victims.

Moreover, the evidence clearly justifies the imposition of the death penalty considering the nature of the offense and the character and record of defendant. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869; *People v. Perez* (1985), 108 Ill. 2d 70.) Although defendant presented testimony as to his good character and background as a hard-working husband and father, the mere existence of this mitigating evidence does not preclude the imposition of the death penalty. During the sentencing process, the court weighs the mitigating factors against the aggravating factors, and the death sentence is imposed only if there are no mitigating factors sufficient to preclude the imposition of that sentence. (*People v. Free* (1983), 94 Ill. 2d 378, 427; *People v. Brownell* (1980), 79 Ill. 2d 508, 534.) Although defendant presented evidence that he was unemployed because of his illness, and that this unemployment, coupled with his disease, led him to participate in the crimes, the record nevertheless shows that defendant was ready, willing and able to begin full-time work on the day trial began. Given defendant's character, his prior record, and the circumstances of this execution-style slaying, it was not improper for the court to conclude that the mitigat-

ing factors presented by defendant were not sufficient to preclude the imposition of the death sentence.

Defendant next contends he was denied a fair sentencing hearing where the trial court improperly admitted unreliable hearsay testimony of unknown accuracy that the victim of defendant's 1971 attempted murder conviction had died. Defendant urges that this testimony was unreliable and improperly introduced as a nonstatutory aggravating factor prior to the court's finding that defendant was eligible for the death penalty. *People v. Owens* (1984), 102 Ill. 2d 88; *People v. Free* (1983), 94 Ill. 2d 378.

As we stated earlier in this opinion, it is not error, in a unitary sentencing hearing, to admit evidence of nonstatutory aggravating factors along with evidence regarding defendant's eligibility for the death penalty. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 432.) Defendant has presented no evidence in contradiction to the presumption that the sentencing court has considered only properly admitted evidence and disregarded that which is improper. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 65-66.) Furthermore,

> "The only limitations upon evidence to be admitted at the aggravation and mitigation phases of the sentencing hearing are relevance and reliability; the hearing is not confined by rules of evidence in effect at the guilt phase of the trial. (*People v. Free* (1983), 94 Ill. 2d 378, 426-27; *People v. La Pointe* (1981), 88 Ill. 2d 482, 495-99; Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e).)" *People v. Brisbon* (1985), 106 Ill. 2d 342, 364-65.

Given this broad scope of inquiry, and the presumption regarding the sentencing court's wisdom, we find no error in the admission of the complained-of testimonies.

With regard to defendant's contention that the assistant State's Attorney made improper insinuations during cross-examination of defendant's wife at the sentencing

hearing, we find that this contention, too, is meritless. We have often stated that the latitude to be allowed on cross-examination rests within the exclusive discretion of the trial court; a reviewing court should not interfere unless it is obvious that that discretion has been abused, resulting in manifest prejudice to the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 269.) Any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes of such examination is to test the credibility of the witnesses. (106 Ill. 2d at 269.) Given that defendant's wife testified that defendant was a fine, upstanding citizen, and that he had lost his job due to his illness, it was certainly proper for the prosecutor to cross-examine Mrs. Thompkins in order to discredit her testimony on direct examination.

Defendant next argues that the circuit court's failure to consider certain evidence offered by defendant in mitigation deprived him of a fair sentencing hearing. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869.) At the sentencing hearing, defendant offered in mitigation 56 letters from friends, relatives, and associates attesting to defendant's good character and asking that the court not impose the death penalty. Defendant argues that the court's comment that he found only one of the 56 letters to be relevant indicates he failed to give proper weight to the majority of the letters.

Contrary to defendant's contention, the court's comments do not indicate that the court failed to consider these letters; rather, he found only one to be most relevant. Illinois law requires that the sentencing authority shall consider "any mitigating factors which are *relevant* to the imposition of the death penalty." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c).) Our review of the record shows that of these letters, the great majority of them were from friends of defendant's par-

ents who were only marginally acquainted with defendant. These letters offer pleas for sympathy and leniency because their acquaintance with defendant had shown him to be a kind, respectful, family man. Of the letters from persons who were personally acquainted with defendant, several were from family members, several knew defendant only when he was younger, and several were familiar with defendant only through his parents and their church organization. It was within the court's discretion to determine that the letter from Mr. Emitt R. Jordan was the most relevant letter of the 56 submitted, and we find no abuse of that discretion in this case.

Defendant next argues that the imposition of the death penalty was improper where the jury, although instructed as to all three forms of murder—intentional, knowing, and felony murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3))—received and returned only general verdicts of guilty. Defendant contends that the court's finding him eligible for the death penalty on the basis that he intentionally killed the decedents was in error because there is no basis for such a conclusion in the jury's verdict.

We first note that defense counsel raised no objection to the submission of the general verdict forms, nor did he tender alternative verdict forms requiring the jury to find defendant guilty or not guilty of intentional, knowing, and felony murder. However, we need not consider the waiver issue because it is clear that there was no error in the return of general verdicts. It is the general rule in Illinois that:

> "[W]here an indictment contains several counts arising out of a single transaction, and a general verdict is returned the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict

must be sustained." (*People v. Lymore* (1962), 25 Ill. 2d 305, 308.)

(See also *People v. Jones* (1975), 60 Ill. 2d 300, 309.) Applying the above rule, we conclude that the jury's return of general verdicts raises a presumption that it found defendant guilty of intentionally murdering Holton and Sheppard. Furthermore, the return of general verdicts does not preclude the imposition of the death penalty. *People v. Garcia* (1983), 97 Ill. 2d 58, 83-85.

Defendant next raises several issues concerning the constitutionality of our death penalty statute which have previously been considered by this court and need not be re-examined here. These include the argument that the statute allows the death penalty to be imposed despite the fact that defendant's convictions were based on accountability and there was no evidence that defendant actually killed or intended the death of another person (*People v. Garcia* (1983), 97 Ill. 2d 58); that the statute places the burden of nonpersuasion on defendant (*People v. Montgomery* (1986), 112 Ill. 2d 517; *People v. Del Vecchio* (1985), 105 Ill. 2d 414); that the statute is mandatory whenever there is no mitigating factor or factors sufficient to preclude the imposition of the death penalty, thus prohibiting the sentencer from exercising mercy and for making a determination that death is not the appropriate penalty (*People v. Montgomery* (1986), 112 Ill. 2d 517; *People v. Owens* (1984), 102 Ill. 2d 88); that the statute vests within the prosecutor the unbridled discretion to seek the death penalty, thus resulting in the arbitrary and capricious imposition of the death penalty (*People v. Montgomery* (1986), 112 Ill. 2d 517; *People v. Brisbon* (1985), 106 Ill. 2d 342; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531); that the statute fails to require pretrial notice of a prosecutor's intent to seek the death penalty (*People v. Caballero* (1984), 102 Ill. 2d 23; *People v. Gaines* (1981), 88 Ill. 2d 342); and that the

statute fails to require the People to prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude the imposition of the death penalty (*People v. Madej* (1985), 106 Ill. 2d 201; *People v. Eddmonds* (1984), 101 Ill. 2d 44). Because these issues have been previously raised, considered, and rejected by this court, and defendant puts forth no new reasons why we should reconsider our prior holdings, we refuse to further discuss them here.

Defendant also raises several issues *pro se* which were not raised in his brief prepared by counsel. Since our review of the record indicates these matters are unsupported by the evidence and are utterly without merit, we decline to discuss them further here.

For the reasons stated herein, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order fixing Wednesday, March 23, 1988, as the date on which the sentence of death entered in the circuit court of Cook County shall be carried out at the Stateville Correctional Center at Joliet. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

The sixth amendment guarantees one accused of a crime "that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." (*United States*

*v. Wade* (1967), 388 U.S. 218, 226, 18 L. Ed. 2d 1149, 1157, 87 S. Ct. 1926, 1932.) Because, as I read it, the majority opinion condones the prosecutor's failure to honor defendant's sixth amendment right to counsel, I am compelled to dissent. In particular, I disagree with the court's holding that "defendant's sixth amendment right to counsel had not yet attached because formal adversary judicial proceedings had not been initiated against him." (121 Ill. 2d at 433.) Not only do I question the conclusion reached, but I am not persuaded by the court's analysis. Instead of building upon our previous discussion of the stage at which sixth amendment rights attach (see *People v. Owens* (1984), 102 Ill. 2d 88, 101), the majority's holding rests on one conclusory sentence: "The complaint did not constitute a formal commitment by the People to prosecute defendant." (121 Ill. 2d at 433.) I believe that this issue, which has been the basis of an appellate court split[1] and an award-winning article (see Robinson, *Defendant's Pre-indictment Sixth Amendment Right to Counsel: Its Attachment and Waiver*, 74 Ill. B.J. 484 (1986)), requires further analysis.

The opinion purports to rely on *Kirby v. Illinois* (1972), 406 U.S. 682, 689-90, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882, but that case neither decided the issue here, nor required any "formal commitment" to prose-

---

[1]Compare *People v. Curtis* (1985), 132 Ill. App. 3d 241, 245-48 (First District, Third Division); *People v. Faulkner* (1980), 86 Ill. App. 3d 136, 139 (First District, Second Division); and *People v. Hinton* (1974), 23 Ill. App. 3d 369, 372 (Second District) (each finding that the right to counsel attached with the filing of a complaint and execution of an arrest warrant) with *People v. Boswell* (1985), 132 Ill. App. 3d 52, 57-59 (First District, Fourth Division); and *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 130 (First District, Fifth Division) (each finding that sixth amendment rights do not necessarily attach upon the mere filing of a complaint and execution of an arrest warrant). See also *People v. Fleming* (1985), 134 Ill. App. 3d 562, 566-67 (First District, Second Division) (applying flexible standard based on degree of prosecutorial involvement).

cute or "formal" adversary judicial proceedings to trigger a defendant's sixth amendment rights. In *Kirby*, the Supreme Court presented the rationale for holding that defendant's right to counsel attaches at or after the initiation of adversary judicial criminal proceedings:

> "The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." (*Kirby*, 406 U.S. at 689-90, 32 L. Ed. 2d at 417-18, 92 S. Ct. at 1882.)

Subsequently, in explaining the *Kirby* Court's reference to adversary judicial criminal proceedings commenced "by way of formal charge [or] preliminary hearing," the Supreme Court wrote: "The prosecution in this case was commenced under Illinois law when the victim's complaint was filed in court." (*Moore v. Illinois* (1977), 434 U.S. 220, 228, 54 L. Ed. 2d 424, 433, 98 S. Ct. 458, 464, citing Ill. Rev. Stat. 1975, ch. 38, par. 111.) The Court went on to explain that by the time of the preliminary hearing, when it is determined whether there is probable cause to bind petitioner over to the grand jury and set bail, there is no doubt that adversarial judicial criminal proceedings under *Kirby* have been initiated. Thus, the *Moore* Court did not have to reach the question presented here: whether the filing of a complaint, the issuance and execution of an arrest warrant and extensive questioning by the assistant State's Attorney mark the initiation of adversary judicial criminal proceedings.

The majority also cites *People v. Owens* (1984), 102 Ill. 2d 88, 101, as support for its holding. But in *Owens*, this court expressly declined to decide the issue. "We note that, to date, neither the Supreme Court (see *Edwards v. Arizona* (1981), 451 U.S. 477, 480 n.7, 68 L. Ed. 2d 378, 383 n.7, 101 S. Ct. 1880, 1883 n.7) nor this court has resolved whether sixth amendment rights automatically attach upon the filing of a complaint. Nor do we find it necessary to resolve that issue here." (*Owens*, 102 Ill. 2d at 101). The *Owens* court did, however, provide some guidance when it pointed out that "there is respectable authority that whether adversarial proceedings commence with the filing of a complaint depends on the degree of prosecutorial involvement." (*Owens*, 102 Ill. 2d at 101.) In view of this suggestion, I believe it is helpful to review the role of prosecutors in the events leading up to the defendant's inculpatory statement to determine whether defendant's right to counsel had attached at the time he made the statement.

On March 17, 1981, a police investigator filed a felony complaint against Willie Thompkins and a warrant for his arrest was issued and executed by about 11 a.m. In addition to police interrogations, between the hours of 3:30 and 9:30 p.m. two assistant State's Attorneys questioned the defendant on three or four occasions for periods ranging from a few minutes to an hour. The next day, after the defendant had been brought to the Markham courthouse for a bond hearing, the assistant State's Attorney gave two police investigators permission to further interrogate the defendant. In fact, Officer Houlihan testified that the assistant State's Attorney had requested him to interrogate the defendant just before the bond hearing. It was at this point, after the defendant had been under arrest for over 24 hours and had been brought to the lockup area directly adjacent to the bond

hearing courtroom, that defendant made the inculpatory statements he contends should have been suppressed.

I believe that under the facts of this case the defendant's sixth amendment rights attached prior to his inculpatory statement. Instead of following our previous suggestion that attachment of the right to counsel may hinge upon the degree of prosecutorial involvement (*Owens*, 102 Ill. 2d at 101), the majority opinion disregards what I view to be quite a high degree of prosecutorial involvement at the time just prior to defendant's bond hearing. Two assistant State's Attorneys had interrogated defendant over the course of several hours after a felony complaint had been filed and defendant had been arrested pursuant to a warrant. The defendant had been brought to the courthouse for his bond hearing and was awaiting the arrival of his attorney when two police investigators, acting upon the assistant State's Attorney's suggestion, questioned, and elicited an inculpatory statement from, the defendant. Given the facts that defendant was at the threshold of his bond hearing, that a complaint for his arrest had issued and that he had undergone intensive interrogation over a period greater than 24 hours, there appears to be no doubt that the assistant State's Attorney was committed to prosecute and that "the adverse positions of government and defendant [had] solidified" (*Kirby*, 406 U.S. at 689, 32 L. Ed. 2d at 418, 92 S. Ct. at 1882).

By basing its decision on the lack of "a formal commitment" to prosecute, the majority turns the initiation of adversary judicial criminal proceedings into "a mere formalism," contrary to the letter and spirit of *Kirby*. (406 U.S. at 689, 32 L. Ed. 2d at 418, 92 S. Ct. at 1882.) *Kirby* suggests that the right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

(*Kirby*, 406 U.S. at 689, 32 L. Ed. 2d at 417, 92 S. Ct. at 1882.) Though I believe it is unnecessary to decide the issue here, there are strong arguments that the mere filing of a felony complaint marks the initiation of adversary judicial criminal proceedings. (See *People v. Curtis* (1985), 132 Ill. App. 3d 241, 245-48.) "If it were otherwise, the use of the pertinent term 'formal charge' in *Kirby* to designate when adversarial judicial proceedings have been initiated would be meaningless, for the term would not be distinguished from 'preliminary hearing, indictment, information, or arraignment.' " *Curtis*, 132 Ill. App. 3d at 247.

But even if the police investigator's filing of a felony complaint for preliminary examination did not itself trigger defendant's sixth amendment rights, the logic of the Supreme Court's sixth amendment decisions dictates a finding that defendant's right to counsel had attached before he made the inculpatory statements. Beginning with *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199, and *Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, the Supreme Court has held that the sixth amendment right to counsel attaches once the suspect reaches the status of an "accused." Though the logic of a line drawn at the point of accusation has often been criticized (see, *e.g.*, Uviller, *Evidence from the Mind of the Criminal Suspect: A Reconsideration of the Current Rules of Access and Restraint*, 87 Colum. L. Rev. 1137 (1987)), the Court has consistently held that formal accusation triggers the suspect's right to counsel. (See *Moran v. Burbine* (1986), 475 U.S. 412, 428, 89 L. Ed. 2d 410, 425, 106 S. Ct. 1135, 1145 (sixth amendment right to counsel attaches at first formal charging proceeding).) Though the Court abandoned *Escobedo*'s "focus of suspicion" test, it has adhered to the rationale underlying *Kirby* and *Escobedo* that the right to counsel would be mean-

ingless if it attaches only after a suspect has been sub-jected to "the prosecutorial forces of organized society" (*Kirby*, 406 U.S. at 689, 32 L. Ed. 2d at 418, 93 S. Ct. at 1882).

Respecting this accusatory demarcation, I think there is no doubt in this case that at the latest, the bond hear-ing marked the point of accusation or initiation of adver-sarial judicial criminal proceedings, especially in view of the type of interrogation that preceded it. The Illinois criminal code requires that a person arrested on a war-rant be taken without unnecessary delay before a judge who must inform the defendant, and provide a copy, of the charge against him, admit the defendant to bail, and advise the defendant of his right to counsel. (Ill. Rev. Stat. 1985, ch. 38, par. 109—1.) These requirements sug-gest that a bond hearing held pursuant to this statute is a "formal charging proceeding" to which sixth amend-ment rights attach. Certainly, where the prosecutor ar-gued for and obtained a denial of bond, as was the case here, one must assume that the government has decided to prosecute the defendant at the time of the bond hear-ing.

Assuming that the right to counsel attached at the defendant's bond hearing, I am unable to find either case law or rationales that suggest that any coherent distinction could or should be drawn in this case between the sixth amendment rights of the defendant at his bond hearing and the defendant's sixth amendment rights just prior to the bond hearing, after the State had demon-strated its intent to prosecute by bringing the defendant to the courthouse. I am bothered by the encouragement the majority's decision gives to prosecutors and police to delay the bond hearing to try to elicit a confession after the decision to prosecute has been made. A United States Court of Appeals has suggested that a United States Attorney's office practice of routinely questioning

uncounseled arrested persons just prior to arraignment "raises serious constitutional questions." (See, *e.g.*, *United States v. Foley* (2d Cir. 1984), 735 F.2d 45, 48.) In this case when asked why the defendant was not brought before the judge when he arrived at the courthouse, the assistant State's Attorney said he thought the police were still preparing their reports. Not surprisingly, there was no suggestion that the delay was due to a lack of prosecutorial commitment. I believe that admitting the inculpatory statements in this case both rewards the State for its own delay and conflicts with the Supreme Court's admonition that "at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." (*Maine v. Moulton* (1985), 474 U.S. 159, 171, 88 L. Ed. 2d 481, 493, 106 S. Ct. 477, 485.) Moreover, to allow the State to delay the bond hearing after it has decided to prosecute defendant may:

> "make the trial no more than an appeal from the interrogation; and the 'right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination.' *In re Groban* [(1957)], 352 U.S. 330, 344[, 1 L. Ed. 2d 376, 387, 77 S. Ct. 510, 519] (Black, J., dissenting). 'One can imagine a cynical prosecutor saying: "Let them have the most illustrious counsel, now. They can't escape the noose. There is nothing that counsel can do for them at the trial." ' [Citation.]" (*Escobedo*, 378 U.S. at 487-88, 12 L. Ed. 2d at 984, 84 S. Ct. at 1763.)

For the foregoing reasons, I believe that the defendant's right to counsel had attached at the time he made the inculpatory statements.

Citing *Owens*, the State argues that defendant waived his right to counsel essentially by waiving his *Miranda* rights. In *Owens*, after noting that the Su-

preme Court had expressly reserved ruling on whether waiver of fifth amendment rights after *Miranda* warnings constitutes a valid sixth amendment waiver, we found a valid sixth amendment waiver because the defendant was "aware of the severity of the situation facing him" and informed by *Miranda* warnings of his right to have an attorney present. (*Owens*, 102 Ill. 2d at 102.) Since our decision in *Owens*, however, the Supreme Court has indicated that a higher standard may apply to the waiver of sixth amendment rights. First, in comparing fifth and sixth amendment limitations on questioning defendants, the Court wrote:

"the reasons for prohibiting the interrogation of an uncounseled prisoner who has asked for the help of a lawyer are even stronger after he has been formally charged with an offense than before. *** Thus, the Sixth Amendment right to counsel at a postarraignment interrogation requires at least as much protection as the Fifth Amendment right to counsel at any custodial interrogation." (*Michigan v. Jackson* (1986), 475 U.S. 625, 631-32, 89 L. Ed. 2d 631, 639, 106 S. Ct. 1404, 1408-09.)

Thus, though the Court did not need to decide the relationship between fifth and sixth amendment waivers (*Jackson*, 475 U.S. at 635 n.10, 89 L. Ed. 2d at 642 n.10, 106 S. Ct. at 1411 n.10), its language suggests that it recognizes the need for a higher sixth amendment waiver standard. (See generally Donlevy, *Sixth Amendment Right to Counsel: Does Miranda Suffice?*, 1988 Chicago B. A. Rec. 13.) Further, the Supreme Court has granted *certiorari* in the only other case in which we applied the *Owens* sixth amendment waiver standard (*People v. Thomas* (1987), 116 Ill. 2d 290), specifically to decide whether *Miranda* admonitions are sufficient to assure that defendant knowingly and intelligently waived his sixth amendment right to counsel at post-indictment interrogations. (See *Patterson v. Illinois* (1987), 484

U.S. 895, 98 L. Ed. 2d 186, 108 S. Ct. 227.) In light of the Supreme Court's suggestions in *Jackson* and its review of *Patterson*, our waiver analysis in *Owens* should be reconsidered, or at least it should not be applied until the Supreme Court decides *Patterson*.

The State should have a higher burden in proving a waiver of sixth amendment rights than a waiver of *Miranda* rights. The point of establishing the waiver of fifth amendment rights is merely to demonstrate that the suspect's statements were given voluntarily. Because the interests protected by the sixth amendment—"the right to rely on counsel as a 'medium' between [the defendant] and the State" (*Jackson*, 475 U.S. at 632, 89 L. Ed. 2d at 639, 106 S. Ct. at 1408-09)—are distinct from the purpose of the fifth amendment, the right to counsel should not be waived merely by establishing a lack of coercion. (*Wyrick v. Fields* (1982), 459 U.S. 42, 54, 74 L. Ed. 2d 214, 223, 103 S. Ct. 394, 399 (Marshall, J., dissenting).) Unlike a suspect who rationally may wish to waive fifth amendment rights in order to clear his name quickly, an accused person has little to gain and much to lose in consenting to uncounseled interrogation after adversarial proceedings have begun. Any police questioning initiated after the adversarial positions are established is most likely intended only to buttress the State's case against the defendant. (*United States v. Mohabir* (2d Cir. 1980), 624 F.2d 1140, 1148.) The fact that the assistant State's Attorney asked the police investigators to interrogate the defendant just before his bond hearing demonstrates that the interrogation here was "not legitimate investigation, but a species of discovery" (*United States v. Clements* (4th Cir. 1983), 713 F.2d 1030, 1034).

In order to admit the fruits of such questioning, the Supreme Court has ruled "it was incumbent upon the State to prove 'an intentional relinquishment or aban-

donment of a known right or privilege' " (*Brewer v. Williams* (1977), 430 U.S. 387, 404, 51 L. Ed. 2d 424, 439, 97 S. Ct. 1232, 1242, quoting *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023.) Moreover, as the Court has repeatedly affirmed, courts should " 'indulge every reasonable presumption against waiver of fundamental constitutional rights' " (*Jackson*, 475 U.S. at 633, 89 L. Ed. 2d at 640, 106 S. Ct. at 1409 (quoting *Zerbst*, 304 U.S. at 464, 82 L. Ed. 2d at 1466, 58 S. Ct. at 1023).) Because the presumption against waiver "applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings" (*Brewer*, 430 U.S. at 404, 51 L. Ed. 2d at 440, 97 S. Ct. at 1242), it is essential to review the waiver standard that applies to the right to counsel at trial in Illinois. Our Rule 401(a) requires that the trial court inform defendant of, and make sure the defendant understands, the nature of the charge against him, the minimum and maximum sentence at stake, and the right to counsel. (107 Ill. 2d R. 401(a).) There is conflicting evidence in this case as to whether defendant was made aware of the charges against him prior to the interrogation that elicited his inculpatory statement, and there is no evidence that defendant knew of the possible sentences associated with those charges. Under these facts, I think that the State has failed to meet its burden of proving that defendant knowingly and intelligently relinquished his right to counsel at the interrogation just prior to his bond hearing. If the defendant's sixth amendment rights were violated without any valid waiver, as I believe to be the case here, defendant's oral inculpatory statement was inadmissible at trial and should have been suppressed. Considering the damaging nature of Investigator Houlihan's testimony to the defendant's inculpatory statements, there is no doubt

that the sixth amendment violation in this case consti-
tuted prejudicial error.

I also believe that the majority has improperly dis-
missed defendant's contention that during closing argu-
ment the prosecutor improperly bolstered the testimony
and credibility of its key witness. (121 Ill. 2d at 422-27.)
I do not understand how the majority can concede that
the prosecutor's reference to Sandra Douglas' state-
ments to the Birmingham police was a comment upon
matters not in evidence, yet still conclude that it did not
improperly bolster her testimony. The prosecutor could
not have been more direct in his assertion to the jury
that the witness had made a prior consistent statement:
"she walk[ed] into a police station and t[old] them ex-
actly what she told you ladies and gentlemen." To make
matters worse, the trial court expressly overruled de-
fense counsel's objection that there was no evidence of
what she told the police, thereby confirming the infer-
ence that there had been a prior consistent statement.
This court has held that such a fact that is not based on
evidence admitted in the case may not properly be ar-
gued before the jury. (*People v. Whitlow* (1982), 89 Ill.
2d 322, 341; *People v. Beier* (1963), 29 Ill. 2d 511, 517.)
Thus, in my opinion, the only question is whether this er-
ror constituted reversible error.

This was reversible error if it is reasonable to con-
clude that the jury was prejudiced by the improper re-
marks. (*Whitlow*, 89 Ill. 2d at 341; *People v. Allen*
(1959), 17 Ill. 2d 55, 63.) Moreover, to the extent that
the State's case was dependent on the credibility of San-
dra Douglas, the error is presumed to be reversible er-
ror. "Where guilt or innocence depends entirely on the
credibility of an accuser and the defendant, no error
should be permitted to intervene. 'Where error is shown
to exist, it will compel reversal, unless the record affirm-
atively shows that the error was not prejudicial.' " (*Peo-*

*ple v. Emerson* (1983), 97 Ill. 2d 487, 502.) Sandra Douglas was the State's principal witness and the only occurrence witness to the crimes; her credibility was crucial to the prosecution. In light of this, I believe that the majority errs when it concludes that the prosecutor's improper comment did not result in substantial prejudice to the defendant.

For these reasons I would reverse the convictions and remand this case for a new trial. Even if I did not believe that the conviction should be overturned, however, I would dissent based on my belief that the Illinois death penalty statute is unconstitutional. For the reasons stated in my dissent to *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), I would vacate the death sentence, and I join Justice Marshall in urging Supreme Court review of "a scheme that gives the prosecutor the unbridled discretion to select, from the group of individuals convicted of an offense punishable by death, the subgroup that will be considered for death." *Eddmonds v. Illinois* (1984), 469 U.S. 894, 896, 83 L. Ed. 2d 207, 208, 105 S. Ct. 271, 272 (Marshall, J., dissenting); see also *People v. Johnson* (1987), 119 Ill. 2d 119, 152-53 (Simon, J., dissenting) (citing cases and articles that argue that prosecutorial discretion must be limited to prevent arbitrary and capricious imposition of the death penalty).