In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2467

WILLIE MARSHALL THOMPKINS, JR.,

*Petitioner-Appellant,*

*v.*

RANDY PFISTER,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 6252—**George W. Lindberg**, *Judge.*

ARGUED NOVEMBER 1, 2011—DECIDED OCTOBER 23, 2012

Before BAUER, FLAUM, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. On December 23, 1980, a patrolling police officer found the body of Gerald Holton lying facedown in a ditch in an unincorporated area of Cook County, Illinois. Holton's hands were tied with telephone cord, and he was shot in the head. The officer discovered the body of Arthur Sheppard nearby, hidden in a clump of trees, similarly executed with his hands bound. For about three months, investigators had no

leads in the murders. A break came when an informant implicated Pamela Thompkins in the killings. Pamela Thompkins was arrested and immediately confessed her role in assisting her former brother-in-law and their mutual friend in a robbery that got out of hand and became a double murder.

The police then arrested Pamela's former brother-in-law Willie Thompkins, Jr., and he too agreed to talk after receiving *Miranda* warnings. At some point during the interrogation, he took a phone call from an attorney who had been contacted by his wife, but continued to talk to police without invoking his right to counsel. The next morning Thompkins was taken to court for a bond hearing. Before the hearing took place, he confessed his involvement in the murders of Holton and Sheppard. A jury convicted him of two counts of murder based on his confession, the testimony of eyewitnesses, and evidence from the scene of the crime. He was sentenced to death. After an unsuccessful direct appeal and more than a decade and a half of state postconviction proceedings, the Governor of Illinois commuted the sentences of all death-row inmates, and Thompkins was resentenced to life. He exhausted his remaining postconviction claims and then sought federal habeas relief on multiple grounds. The district court denied the petition.

We authorized an appeal on two issues: (1) whether Thompkins's confession should have been suppressed because it was taken in violation of his Sixth Amendment right to counsel; and (2) whether trial counsel was

constitutionally ineffective for failing to interview several potential witnesses. On the first issue, the Illinois Supreme Court held that the right to counsel had not yet attached when Thompkins confessed, so the trial court properly declined to suppress the confession. On the second, the court rejected the claim of ineffective assistance of counsel based on procedural default and lack of factual support. On federal habeas review, these decisions are entitled to substantial deference. Because the state supreme court did not unreasonably determine the facts or unreasonably apply federal law, *see* 28 U.S.C. § 2254(d), we affirm the denial of habeas relief.

## I. Background

Thompkins's case was tried in Cook County Circuit Court more than three decades ago in June 1982. *See People v. Thompkins* (*Thompkins I*), 521 N.E.2d 38, 42-45 (Ill. 1988) (direct appeal); *People v. Thompkins* (*Thompkins II*), 641 N.E.2d 371, 374-76 (Ill. 1994) (first postconviction appeal). The key witnesses for the prosecution were Keith Culbreath and Sandra Douglas. Our account of the facts is based primarily on their testimony as described in the Illinois Supreme Court's opinions in *Thompkins I* and *Thompkins II*.

On December 22, 1980, Willie Thompkins and Ronnie Moore were at Douglas's home in Harvey, Illinois, in southern Cook County, hatching a plan to rob a couple of cocaine dealers. Culbreath stopped by around noon. Thompkins took him into a bedroom and asked if he

wanted to make some money by helping him "stick-up" a "couple guys." He agreed to participate but told Thompkins he wanted to go home first and get a ski mask so he couldn't be identified. Thompkins told him, "don't worry about it, [I'll] take care of that." Culbreath saw two guns on the bed, got cold feet, and left Douglas's house.

Later that day, Thompkins, Moore, and Douglas drove to the home of Thompkins's former sister-in-law Pamela Thompkins ("Pamela"). Pamela arranged for Gerald Holton and Arthur Sheppard to come over on the pretense of doing a cocaine deal. When Holton and Sheppard arrived, the group moved to the basement where there was a small kitchen and recreation area. Holton and Sheppard produced a baggie of cocaine and placed it on the kitchen table. Thompkins then stood in the door frame, pointed a gun at the two men, and demanded that they put their hands on the table. They did as they were told. Moore and Thompkins then searched Holton and Sheppard, taking a gun, their wallets, and a beeper. Moore and Thompkins bound the hostages' hands with telephone cord and dragged them by their feet from the kitchen to the recreation area. Douglas retreated upstairs.

A few hours passed. At some point Pamela joined Douglas upstairs. While the two women were talking, Douglas heard a loud banging sound in the basement, followed by two gunshots. Pamela blurted out that she "told them not to do it here, she knew it wouldn't go according to plans." Douglas ventured part way down

the stairs and got a glimpse of a body she assumed was Holton's because she recognized his shoes. She then saw Moore, holding a knife, lead Sheppard—alive but still bound—in the direction of the garage. She watched as the others dragged Holton's body to the garage. Thompkins, Moore, and Pamela then drove off in two separate cars, with Sheppard as their hostage and Holton's body in the trunk of one of the cars. Douglas estimated that this took place at around 8 or 9 p.m.

About 35 minutes later, Douglas received a phone call from Thompkins telling her to "clean up a little bit" in the basement. She was so repulsed by the scene that she couldn't do it. The next day, however, she went with Pamela and Thompkins to the home of Delmar Watkins. Thompkins ordered Douglas to help Watkins wash the blood from the trunk of the car where Holton's body had been. The following day, Douglas stood guard while Watkins sprayed the trunk of the car with water.

In the meantime on December 23, a patrol officer found the bodies of Holton and Sheppard, hands bounds and shot in the head, lying about 65 feet apart in an unincorporated area of Cook County near Markham, Illinois. Investigators initially had no leads. A break in the investigation came on March 13, 1981, when Doris Ferguson told the police about a December 23 phone call she received from Pamela Thompkins asking for advice about how to remove bloodstains from her basement and garage. When Ferguson pressed for an explanation of how the bloodstains got there, Pamela spilled

the entire story. Police used Ferguson's statement to obtain a search warrant for Pamela's home. At the scene the officers saw bloodstains in the basement and arrested Pamela, who gave a detailed confession describing the entire sequence of events, including Willie Thompkins's involvement in the murders.

Based on Pamela's statement, police arrested Thompkins on March 17, 1981. That same day, a complaint for a preliminary examination was filed against him. Late that afternoon, Assistant States Attorney Paul Perry met with Thompkins, gave him *Miranda* warnings, and asked if he was willing to talk. Thompkins said he understood his rights and agreed to talk to Perry. At some point during the interrogation, an officer interrupted to say that Attorney George Howard had called asking to speak to Thompkins. Perry stopped the interview and Thompkins left the room to return the attorney's call. Thompkins's wife, Barbara, had contacted Howard to ask for his help, but Howard later testified that he was never actually retained.

When Thompkins returned to the interview room, Perry asked him if he "still want[ed] to talk to us after talking to George Howard?" Thompkins said that he did. Perry reminded him of his right to have an attorney present during the interview. Thompkins replied: "No, that's all right; I'll talk to you now." The interview resumed, but Thompkins did not make any inculpatory statements on March 17.

The next morning, March 18, the police took Thompkins to court for a bond hearing and placed him in a lockup

near the courtroom where the hearing would be held. Thompkins and Pamela were to appear in court at the same time. The presiding judge called and passed the case twice, apparently awaiting the arrival of a private attorney for Thompkins; Pamela was represented by a public defender. On the third go-round, Thompkins consented to representation by Pamela's public defender for the limited purpose of the bond hearing. On this understanding, the judge went ahead with the hearing that day, though the evidence conflicts about whether it took place in the late morning or early afternoon.

At some point during the morning court session, Investigators Jim Houlihan and Ronald Bennett consulted with ASA Perry about whether they could interview Thompkins. Perry authorized the interrogation. After fresh *Miranda* warnings, Thompkins confessed his involvement in the murders. He agreed to repeat his statement to Perry, so Houlihan left the lockup to summon the prosecutor. Thompkins maintains in his habeas petition that the interrogation occurred *after* the bond hearing. However, Perry testified at the suppression hearing that he saw the investigators enter the lockup sometime between 11:30 a.m. and 1 p.m., before the bond hearing was held. *See Thompkins I*, 521 N.E.2d at 50. It is undisputed that when Perry came back to the lockup, Thompkins was returning from a separate holding area where inmates could make phone calls. Thompkins told Perry that he had "just spoke[n] to his lawyer on the phone" and no longer wanted to talk.

Because Pamela's confession contained details about Thompkins's involvement in the murders, the two de-

fendants were tried separately.[1] Thompkins moved to suppress his confession, arguing that it was taken in violation of his Sixth Amendment right to counsel.[2] Investigators Houlihan and Bennett, ASA Perry, and Attorney Howard testified at the suppression hearing for the prosecution, and Thompkins testified on his own behalf. The trial judge denied the motion. Thompkins was convicted by a jury of two counts of murder and related charges based largely on his confession and testimony from Douglas and Culbreath, corroborated by evidence obtained in the search of Pamela's home. The capital-punishment phase of the case was tried to the court, and Thompkins was sentenced to death.

On direct appeal the Illinois Supreme Court affirmed the convictions and sentence, *see Thompkins I*, 521 N.E.2d at 63, and extensive postconviction proceedings followed. The state supreme court rejected most of

---

[1] Pamela Thompkins was convicted of conspiracy to commit murder and armed robbery in a bench trial in which the parties stipulated that she participated in the crimes because Willie Thompkins and Ronnie Moore threatened to kill her and her children. She was sentenced to four years in prison. Moore remained at large until 1984 and was eventually convicted of murder and related offenses and sentenced to life.

[2] He also sought suppression on Fifth Amendment grounds, alleging a violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Our certificate of appealability covers only the Sixth Amendment challenge to the admission of his confession.

Thompkins's postconviction claims, but ordered a new sentencing hearing. *See Thompkins II*, 641 N.E.2d at 395. The trial court reimposed the death sentence, and the case returned to the state supreme court, which twice remanded for further proceedings regarding the sentence. *See People v. Thompkins* (*Thompkins III*), 690 N.E.2d 984 (Ill. 1998); *People v. Thompkins* (*Thompkins IV*), 732 N.E.2d 553 (Ill. 2000).

Before the remand proceedings ordered in *Thompkins IV* were concluded, the Governor of Illinois commuted the sentences of all prisoners on death row, and Thompkins was resentenced to two concurrent terms of life in prison. After exhausting his remaining sentencing claims in the state courts, *see People v. Thompkins* (*Thompkins V*), 876 N.E.2d 1088 (Ill. 2007), Thompkins timely petitioned for federal habeas relief under § 2254 alleging multiple grounds for relief. The district court denied the petition, and this appeal followed.

## II. Discussion

Federal habeas relief from a state-court criminal judgment "is not easy to come by," *Woods v. McBride*, 430 F.3d 813, 816 (7th Cir. 2005), because the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires us to "defer to a great extent to the decisions of the state courts," *Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008). A federal court may not grant a writ of habeas corpus unless the challenged state-court adjudication "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). Accordingly, we will not disturb a state court's application of federal law "unless it is 'both incorrect and unreasonable.'" *Carter v. Thompson*, 690 F.3d 837, 843 (7th Cir. 2012) (quoting *Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010)). "Unreasonable" in this context "'means something like lying well outside the boundaries of permissible differences of opinion.'" *West v. Symdon*, 689 F.3d 749, 751 (7th Cir. 2012) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)). The state court's factual determinations are entitled to a presumption of correctness, and the petitioner has the burden of overcoming this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011).

We review the district court's denial of a § 2254 petition de novo. *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). Our review is limited to two questions on which we granted a certificate of appealability: (1) whether Thompkins's confession was obtained in violation of his Sixth Amendment right to counsel and thus should have been suppressed; and (2) whether trial counsel's failure to interview and present the testimony of several potential witnesses amounted to constitutionally ineffective assistance of counsel. The state supreme court decided the first issue in *Thompkins I* and declined to revisit this ruling in *Thompkins II*. The court decided

the second issue in *Thompkins II*, the first of the postconviction appeals. *Thompkins III*, *IV*, and *V* were later postconviction appeals on sentencing issues not relevant here.

### A.  Thompkins's Confession

It is well-established that the Sixth Amendment right of an accused person "to have the Assistance of Counsel for his defence," U.S. CONST. amend. VI, attaches at "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). It is likewise settled law that an appearance before a judicial officer in which the accused is advised of the charges against him constitutes the initiation of "adversary judicial criminal proceedings" for Sixth Amendment purposes. *See Rothgery v. Gillespie County, Tex*., 554 U.S. 191, 198-99 (2008); *Brewer v. Williams*, 430 U.S. 387, 399 (1977). Everyone agrees that Thompkins's bond hearing on March 18, 1981—the day after his arrest—qualifies as the "initiation of adversary judicial proceedings" against him for Sixth Amendment purposes. Once the Sixth Amendment right to counsel has attached, government agents may not question an accused without his counsel present unless he consents to be questioned without his counsel. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).

In *Thompkins I* the Illinois Supreme Court held that Thompkins's right to counsel had not yet attached at

the time he confessed, so the trial judge properly denied the suppression motion. 521 N.E.2d at 50-52. In so holding, the court identified the correct legal standard, citing the Supreme Court's decision in *Kirby*, and also *Moran v. Burbine*, 475 U.S. 412 (1986); *Maine v. Moulton*, 474 U.S. 159 (1985); *United States v. Gouveia*, 467 U.S. 180 (1984); and *Brewer*, 430 U.S. at 399. *See Thompkins I*, 521 N.E.2d at 51. The court then rejected Thompkins's argument that the right to counsel attached immediately after his arrest, when the complaint for preliminary examination was filed on March 17. *Id.* The court held that under *Kirby* Thompkins's right to counsel attached at the bond hearing, and because Thompkins confessed to Houlihan and Bennett *before* the hearing was held, his confession was properly admitted against him at trial.[3] *Id.* The court declined to revisit this ruling in *Thompkins II*, the first postconviction appeal, because the affidavit Thompkins submitted in support of his postconviction motion contradicted his testimony at the suppression hearing. 641 N.E.2d at 384.

Thompkins no longer argues, as he did in the state-court proceedings, that his Sixth Amendment right to counsel attached when the complaint for a preliminary

---

[3] The Illinois Supreme Court also rejected Thompkins's claim that the confession should have been suppressed because it was obtained in violation of his Fifth Amendment rights. *People v. Thompkins* (*Thompkins I*), 521 N.E.2d 38, 51-52 (Ill. 1988) (affirming the trial court's ruling that no violation of *Miranda* had occurred). As we have noted, this issue is not within the scope of our certificate of appealability.

examination was filed. The concession is prudent. Under Illinois law a complaint for a preliminary examination does not initiate formal felony proceedings. *See* 725 ILL. COMP. STAT. 5/111-2(a) ("All prosecutions of felonies shall be by information or by indictment."); *People v. Garrett*, 688 N.E.2d 614, 618-19 (Ill. 1997) (holding that a complaint for preliminary examination is not a formal charge in a felony case); *People v. Mann*, 794 N.E.2d 425, 431-32 (Ill. App. Ct. 2003) (observing that "a complaint alleging a felony initiates no prosecution whatsoever"). Indeed, the Supreme Court has noted that in Illinois it is the preliminary hearing itself, not the filing of a complaint for preliminary examination, that initiates adversary judicial proceedings in felony cases. *See Moore v. Illinois*, 434 U.S. 220, 228-29 (1977) (noting that under Illinois law adversary felony proceedings are initiated not at the time a complaint is filed but at the subsequent preliminary hearing); *Edwards v. Arizona*, 451 U.S. 477, 480 n.7 (1981) (repeating this observation from *Moore*).

Accepting the error in his prior argument, Thompkins has shifted focus and now attacks the state court's finding that he confessed before the bond hearing. *See Thompkins I*, 521 N.E.2d at 50 (describing the chronology of events and finding that the confession was given "immediately prior to defendant's bond hearing"). He argues that the evidence "plainly demonstrates" that Houlihan and Bennett questioned him *after* the bond hearing. This is a new factual claim, and it is arguably procedurally defaulted because Thompkins did not adequately develop it in the state court. *See Suh v. Pierce*,

630 F.3d 685, 690 (7th Cir. 2011); *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). On direct appeal he argued that his right to counsel attached when the complaint was filed on March 17 and that he did not validly waive his right to counsel after that point. *See Thompkins I*, 521 N.E.2d at 50-52. Later, in postconviction proceedings, he submitted an affidavit claiming that the police refused his request to call Attorney Howard, which contradicted his testimony at the suppression hearing. *See Thompkins II*, 641 N.E.2d at 384. He first raised the claim about the chronology of events in his § 2254 petition.

Procedural default aside, the state court's factual findings are entitled to a presumption of correctness, and Thompkins has the burden to overcome the presumption by clear and convincing evidence. He has not done so. It is true that the record does not establish the precise time the bond hearing occurred. The transcript from the hearing does not indicate when the hearing started and ended, although at several points the presiding judge said "this morning" when referring to the warnings he was then providing to both defendants. Thompkins testified at the suppression hearing that Houlihan and Bennett questioned him in the afternoon. On the other hand, ASA Perry testified that Houlihan and Bennett interviewed Thompkins *before* the bond hearing, and although he could not say precisely what time the interview occurred, he estimated that he saw the investigators enter the lockup sometime between 11:30 a.m. and 1 p.m. Based on Perry's testimony, the state supreme court found that Thompkins confessed "immediately prior to [the] bond hearing." *Thompkins I*, 521 N.E.2d at 50.

In evidentiary conflicts like this, our standard of review requires that we defer to the state supreme court's decision. The state court was entitled to accept Perry's testimony about the chronology of events. Thompkins has not rebutted the AEDPA presumption that the state court's fact-finding is correct; he has simply pointed to evidence supporting his version of the sequence and timing of events. Nor has he carried his burden of demonstrating that the state court's determination of the facts was unreasonable; identifying conflicting evidence is not enough. Accordingly, the district court properly denied habeas relief on the Sixth Amendment right-to-counsel claim.

## B. Ineffective Assistance of Counsel

Thompkins also contends that his trial counsel was constitutionally ineffective for failing to interview several witnesses who could have offered exculpatory testimony. Under the familiar test established in *Strickland v. Washington*, a claim of ineffective assistance of counsel requires a showing that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that the "deficient performance prejudiced the defense." 466 U.S. 669, 687 (1984). Judicial scrutiny of counsel's performance is "highly deferential," *id.* at 689, and under AEDPA we defer to the state court's application of *Strickland* on federal habeas review, meaning that our evaluation of counsel's performance is "doubly deferential," *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).

Thompkins's *Strickland* claim rests on an alleged failure to investigate potential witnesses. Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reason-ableness in all the circumstances, applying a heavy mea-sure of deference to counsel's judgments." *Id.* Thompkins argues that his trial counsel should have interviewed and presented testimony from his wife, Barbara, as well as Karen Hayes and Tina Pitts—all of whom, he says, would have provided an alibi. He also claims his counsel was ineffective for not interviewing Pamela Thompkins.

Regarding the claimed alibi, Thompkins contends that Hayes and Pitts would have testified that he was with them during the day on December 22, contradicting the testimony of Douglas and Culbreath. He says his wife, Barbara, would have testified that he was home with her at 9 p.m. on December 22, around the time of the murders. It is not clear what testimony Pamela would have provided beyond what she told police in her detailed confession, which inculpated Thompkins.

The Illinois Supreme Court rejected Thompkins's *Strick-land* claim as to Hayes and Pitts on procedural grounds because he did not submit affidavits from them with his postconviction petition, as required by Illinois law. *Thompkins II*, 641 N.E.2d at 378; *see also* 725 ILL. COMP. STAT. 5/122-2 (1964). This is an independent and adequate state ground for rejecting this part of the *Strick-*

*land* claim, which bars review in federal court unless Thompkins can show cause and prejudice or that a miscarriage of justice would result if we do not review the claim. *See Cone v. Bell*, 556 U.S. 449, 465-66 (2009); *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009). "A state law ground is independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case." *Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010). "A state law ground is adequate when it is a firmly established and regularly followed state practice at the time it is applied." *Id.*

The state supreme court plainly relied on the affidavit rule to bar Thompkins's claim that his counsel was ineffective for not interviewing Hayes and Pitts. *See Thompkins II*, 641 N.E.2d at 378 ("The defendant has failed to submit affidavits from Pitts and Hayes themselves, however, and thus we are precluded from considering this issue further."). Moreover, the affidavit rule is established by state statute, 725 ILL. COMP. STAT. 5/122-2, and regularly followed by Illinois courts, *see, e.g., People v. Guest*, 655 N.E.2d 873, 883 (Ill. 1995).[4] Thompkins must

---

[4] Although the Illinois Supreme Court has suggested that noncompliance with the affidavit rule might be forgiven in certain circumstances, *People v. Reeves*, 107 N.E.2d 861, 864 (Ill. 1952), that does not mean that the rule is not regularly followed and is therefore inadequate, *Promotor v. Pollard*, 628 F.3d 878, 886-87 (7th Cir. 2010). Discretionary state procedural

(continued...)

therefore establish cause for and prejudice from the procedural default.[5] He has a steep hill to climb:

> Cause for a default is ordinarily established by showing that some type of "external impediment" prevented the petitioner from presenting his claim. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). Prejudice is established by showing that the violation of the petitioner's federal rights "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.*

*Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010).

Thompkins argues that Hayes and Pitts were impossible to find after the trial and his inability to locate them amounted to an "external impediment" preventing his compliance with the affidavit rule. But the rule requires the petitioner to include *either* affidavits from the witnesses who will support the petitioner's postconviction claims *or* a statement explaining why affidavits are unavailable. *See* 725 ILL. COMP. STAT. 5/122-2. Thompkins's petition for postconviction relief included neither; he did not submit affidavits from Hayes and

---

[4] (...continued)
rules may still constitute independent and adequate state grounds. *Beard v. Kindler*, 130 S. Ct. 612, 618 (2009).

[5] Thompkins does not argue that without federal habeas review, he will suffer a fundamental miscarriage of justice, so we do not address this ground for relief from the procedural default.

Pitts, nor did he explain why affidavits from them were unavailable.

Even assuming that Thompkins could establish cause for the procedural default, he cannot establish prejudice. The only indication of the testimony Hayes and Pitts would have given is Thompkins's own affidavit asserting that they would have provided an alibi. This falls far short of establishing prejudice. A *Strickland* claim based on counsel's failure to investigate a potential witness requires a specific, affirmative showing of what the missing witness's testimony would be, and this typically requires at least an affidavit from the overlooked witness. *See Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997); *United States ex rel. McCall v. O'Grady*, 908 F.2d 170, 173 (7th Cir. 1990); *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987). Thompkins's own affidavit is not enough.

Thompkins also challenges the state supreme court's rejection of his claim that counsel was ineffective for failing to interview Pamela. On this aspect of the *Strickland* claim, the state supreme court began by noting that counsel had successfully argued for severance because Pamela's defense was antagonistic to Thompkins's; based on the contents of her confession, her testimony would have been harmful rather than helpful to his case. *See Thompkins II*, 641 N.E.2d at 377-78. The court easily rejected Thompkins's evidence to the contrary; he relied on an unauthenticated hand-written letter dated January 26, 1983, in which Pamela purported to recant her statement implicating

Thompkins in the murders. *Id.* The court said the letter was of "doubtful utility" because it was dated six months *after* Thompkins's trial and Pamela had "recanted the recantation" the very next day, on January 27, in a stipulation at the beginning of her own trial. *Id.* Under these circumstances, the court did "not believe that counsel may be faulted" for failing to "seriously consider the prospect of calling Pamela as a defense witness." *Id.* at 377. We, in turn, can find no fault with the state court's decision on this point. To the contrary, it was eminently reasonable, and Thompkins has given us no good reason to question it.

That brings us to Barbara, and whether trial counsel was ineffective for not calling her as an alibi witness. Thompkins claims she would have testified that he was home with her sometime around 9 p.m. on December 22, 1980. Barbara stated in her affidavit that she was interviewed by Thompkins's defense attorney and told him she "was willing to testify." She also said she told counsel that "because I was a Jehovah's witness, I could not lie," and the interview proceeded no further. Barbara explained in her affidavit that this statement was meant to reinforce her religious beliefs, not to suggest that she thought she "would have to lie about anything to testify for Willie." She said if counsel had questioned her further, she would have told him that "Willie must have been home after 9:00 in the evening on December 22, 1980, because that was when I would get up from my nap to go to work, and Willie drove me to work that night."

Setting aside the question of whether trial counsel misinterpreted Barbara's reference to her religious beliefs, the state supreme court quite reasonably concluded that it "should defer to counsel's decision not to present [Barbara's] testimony." *Id.* at 378. Her affidavit makes it clear that she could not provide a clean alibi. She claimed only that Thompkins "must have been home after 9:00 in the evening on December 22" because that was when she ordinarily got up from her nap to go to work, and he drove her to work that evening. That is not incompatible with Douglas's testimony that the murders occurred around 8 or 9 p.m. Barbara's affidavit was at best equivocal and not inconsistent with Douglas's testimony. It does not call into question the reasonableness of the state supreme court's decision not to fault counsel for not presenting her as a witness. Indeed, *Strickland* requires this kind of deference to counsel's strategic decisions. When considered through the lens of our doubly deferential standard of review, Barbara's affidavit does not come close to establishing that the state supreme court unreasonably applied *Strickland*.

AFFIRMED.